EXHIBIT A

# To: Dale Dorning
# From: Patti Kammeyer

When I sit down and reflect upon the way in which my mother's initial murder investigation was handled--or rather mishandled--by Jim Kramer--I feel a cross between disbelief, rage and as though my family was victimized not just once but twice. Jim Kramer had the power, knowledge, information and opportunity to put an end to the suffering that we endured as a result of Albert's reign of terror and to bring closure to the most tragic event a family has ever suffered. Instead, he choose to become part of the problem and in my eyes shares the guilt for this tragedy. I, and my family, placed our trust in the Sharonville Police Department and more specifically, Jim Kramer, and he made us his victims. When you meet with him--make sure he knows the anger and hate I feel for what he did to me and my family. I have not had a peaceful day since May of 1981--I'm sure he has long since forgotten my mom and moved on with his life. Until we get the justice we were initially denied we will never move on and have peace. My mother, Marie Wright, was a wonderful, caring, spunky, hard working mother, daughter, sister and grandmother who fell in love with the wrong person. She did not deserve to be beaten, tortured, robbed and ultimately to have her throat slit for this error in judgment. Kramer was privy to all of this and more and did nothing--I don't have the power to punish him and make him cry the tears and feel the hurt and experience the loss that I've gone through. But, he can rest assured that unless he gives me every shred of information and evidence that I need to put Albert Schuholz in jail for the rest of his natural life--I will make it my personal crusade to see to it that every person in Cincinnati, Sharonville, and the Terre Haute area knows what he did. I will also file a civil lawsuit in an attempt to ruin him financially. I'm tired of being the victim--either he does now what he should have done in 1981--or he can deal with me.

Now on to the specifics--

The Friday that I received the phone call from my Uncle John Barry that my mother had been found and been beaten the death--I turned to my foster daughter and said--well Albert finally did it--but at least the police will arrest him and he'll get his punishment. Then I called my husband to come home from work, made arrangements for my in-laws to come and take care of my infant children--packed and started out for Cincinnati.

The whole trip down I just kept thinking if I could just get there soon enough that I could make it all better--I thought Uncle John made a mistake and my mom was probably just badly hurt and if I could get there fast enough--if she could only hear my voice--I knew how much she loved me and I knew she wouldn't leave me.

When I arrived in Cincinnati I immediately went to my mom's apartment in Shadow

Hill. There were a lot of police cars and people around--I started to just walk into the apartment building--because again my thoughts were getting to my mom and making it all better--I was stopped be a uniformed policeman and I told him my mom was up there and I had to go get her. I remember he told me the bodies had been removed and taken to the morgue and my mom wasn't there. I remember feeling as if a wave of blackness washed over me because I was just starting to believe that maybe my mom was dead. I asked him if they had arrested Albert Schuholz yet because he did this and he told me to wait and went to get the person in charge. This was when I first met Jim Kramer--he came and wanted to know if I had any information about the crime and I said yes that Albert Schuholz had murdered my mom. I told him he has been threatening, had tried before, the Sharonville Police had reports and my mom had people tell her he was going to kill her--he told me to go home and as soon as the crime scene was secure he would call me. At the scene I asked him where my mom was and he told me she had been taken to the morgue. I asked him how he was so sure it was my mom and he said he had some friend of mom's identify her. I found that highly irregular and wondered why a member of the family wasn't permitted to do that. There were media people all around and he warned me not to talk to them--that I needed to go to Aunt Bert's and he would call me later--to stay by the phone. This was my first mistake--I should have talked to the newspapers and television people and told them my story but I foolishly placed my trust in Jim Kramer--went to Aunt Bert's and waited for the phone to ring.

All that evening--I waited for the phone to ring--I called my brother who was in Maine and making arrangements to get to Cincinnati as soon as possible--I talked to mom's attorney who told me about the forged document at the divorce hearing (which mom had already told me about), he then filled in some blanks about the handwriting experts reports and told me he had my mom's will and that as soon as we picked Jim up from the airport on Saturday we should come to his office for the reading of the will.

I kept waiting to hear from the police but the only information I had about what was going on was from the television news.

And still I waited--finally Saturday afternoon--the phone rang and I was told to come to the Sharonville Police Department for questioning.

I still remember that experience--or the feelings that went with that experience--it was as if Kramer was saying to me that my mom was always crying wolf--that she never pressed charges--that I had no evidence that Albert did this--that my mom was seeing a man by the name of Don Butler and maybe he was involved--that Starla didn't have the best of reputations and maybe they had picked some men up and brought them back to the apartment and it turned ugly--that Albert Schuholz had an airtight alibi and was not involved--that I had no "smoking gun" and could not place him at the scene-- that the police were "doing their job" gathering evidence from the crime scene and would be back in touch with me. I remember being so upset and telling him they needed to arrest Albert before he hurt one of us--he said they could arrest him on suspicion but could only hold him for 72 hours and then he'd be mad and back out on

the streets so it was better to let things alone until they had more evidence. He told me to "just sit tight" and they would have this solved in a matter of days. Again, he told me not to talk to any reporters because it would "hurt the investigation".
I can't tell you exactly when each of these next things happened but they happened before I left Cincinnati after burying my mom--I was there about a week and then had to return home to take care of my children

    *I told Kramer that he should get a search warrant and look for mom's jewelry if he didn't find it at the scene. I told him my mom had a diamond pinky ring, a band with three diamonds and the ring she wore as an engagement ring, she also had a 14 carat gold wrist watch with diamonds around the face and a diamond watch with a diamond band. I was sure mom had these pieces with her and if they weren't there then the person (Albert) responsible for this had the jewelry. PLEASE when you finally interview Bruce Wright ask him about mom's jewelry. There were 3 pieces missing-- the diamond watch, the pinky ring and the ring with three diamonds. I was to revisit the issue of mom's jewelry many times as the investigation drug on--I got pictures of mom with all the pieces, I got copies of descriptions--I did everything I could do to try to get him to follow this lead. At some point--several years later--Kramer gave me jewelry from my mom's apartment and thought that ended the discussion. BUT--three of the pieces I told him about from day 1 were not there. Either they were taken by the murderer or he stole them which is also a possibility. Find out from Bruce Wright if he or Kramer took the jewelry.

    *I asked to be allowed to go through my mom's apartment--I thought I could tell what was missing and that would help. I was not allowed to do this--Jimmy was allowed to go to the door and they went in and got the clothes we buried my mom in. At some point--and this is another one of those things I don't understand--Kramer went through the apartment and had one of my mom's co-workers-Gail Weir (I think that's the last name)--to see if anything was missing.

    *After a few days went by I went back to the police station and told Kramer that as time went on it was less likely the crime would be solved. He agreed the first few days were critical. I asked him if it would help if I went on t.v. and asked if anyone who had information would call or to offer a reward I mentioned figures from 10 to 50 thousand. He said that was absolutely not a good idea. He said I had to keep quiet because they were close to solving the case and anything I would do would just hurt the investigation. He said MAYBE at some point we could do that but definitely not now.

Now the rest of these things are out of sequence--if I had my calendar from 81 I could reconstruct better but here are some things I remember

    *at one point I heard a psychic on television who had helped police departments solve cases and I contacted her. I was desperate--grasping at any straw--and she agreed to talk to the Sharonville Police Department but would not talk to me-- I gave Kramer all the information and begged him to call--after all what did we have to lose? But--although he gave me this song and dance about I didn't understand how

[handwritten margin note: Gail Weir -- of Crawford ??]

psychics worked and the information she gave was in symbols and I wouldn't understand--I don't honestly know if he ever actually made the call. Again--it was a long shot but a shot.

*A week or so after the murder--Ed Utz (mom's attorney) loaded up all the files he had on mom's case and drove them out to Sharonville and offered to let Kramer make copies of anything and everything. Kramer refused. He said if Ed had anything important--he should have his secretary copy it and send it to him. It was at this point that Utz began to be very critical of the police.

*I told him about the confusing phone calls I was getting from Dr. Stevens and he said Dr. Stevens was just sweet on mom and not to pay any attention to him. I asked Dr. Stevens and to my knowledge he was never interviewed by Sharonville Police.

*Time after time after time--I offered names, ideas, possibilities and Kramer continually refused to take the knowledge and information I had and follow up on it. I knew mom and Al's relationship probably better than anyone--I most certainly knew my mom better than anyone and yet Kramer would either not take my calls (and I'd talk to Homer or Shappa) or after a short while--start to say that this case would never be solved and Sharonville was a big place and he had to devote his time to the current crimes and just didn't have the time to work on this very much. Oh yes--we had a double homicide and yet it was quickly demoted off the top of the priority list and only given time once in a while if the mood struck him. There was no determination to solve this crime and prosecute the people--person--responsible.

*Very shortly into the case--within two months--our family began to suspect a "dirty cop"--at one point we heard (and I can't remember the specifics) that Kramer had taken a payoff from Al. Just his whole approach and demeanor shouted that things just weren't right. Among the family we always knew that somehow Kramer was involved in a cover up or in not following through but even when I talked to Homer and Shappa they'd say he just had an ego and this was his case and if we went to the public with our suspicions we'd hurt the case so we had to keep quiet. And yet--both of them were critical of the way things were being handled but neither of them blew the whistle or offered us help on how to deal with him.

*An agency from either Hamilton County or the federal level offered to come in and help with analysis of evidence and Kramer refused the help. Mom's car was driven from the scene and they offered to go through the car and gather evidence. Kramer refused. After Kramer went through the car he said he only found one piece of evidence--one single hair--that it belonged to an African American and that it was not Al's which was further proof that he tried to give me that Al was not involved. He said he checked and mom had recently had her car washed and this hair was probably from the person who washed her car. Now we know it was probably from Bruce Wright--why wasn't this followed up on? Why didn't ▮▮▮▮▮▮▮▮▮▮ expertise help? Where is the hair ▮▮▮▮▮

with so much more--mysteriously and conviently disappeared?

"When my husband and I went to clean out the apartment--we were with Starla's daughter. We were all so amazed at the way in which things were different--Starla's purse was there--money missing but still there. My mom's purse was missing. Seems to me a robber would take both or neither--if the police took the purse as evidence why did they take only my mom's? Starla's brief case was there with everything in tact--all of my mom's papers were missing. Again--this didn't make sense. It just seemed and felt like whoever took things concentrated on my mom's things. I called Kramer and was just beside myself because this was more indication that this was not a random crime but very specifically aimed at my mother. It to this day makes me suspect that Albert was in that apartment. Would Bruce Wright be smart enough to only take my mom's things? It was almost as if it were a brag--got you Marie--and that's the kind of ego Albert had. Also, the glove left at the crime scene--again that would be something Albert would do--to flaunt how invincible he thinks he is. And I guess he was invincible--he had Kramer in his back pocket.

"Over the next year and for many years there after I made many calls to Sharonville. I called on mom's birthday, I called around holidays--I wanted her to be remembered. Schappa and Homer were always sympathetic but not helpful because it wasn't their case--Kramer made me feel as though it was an interruption to his busy day--but he'd give me a few platitudes before hanging up. It was demeaning to me.

"We got so frustrated--we begged Kramer to go ahead and prosecute Albert for plotting the murder if not for the actual murder. He kept saying we didn't want to do that because he'd only get a few years and if evidence ever came up we could not use it to prosecute him for murder because that would be double jeopardy. We knew there was a 7 year statue of limitations regarding this crime--after we got to the 6th year--we were ready to settle for anything. But------again Kramer just would not budge.

If I sat and thought and had my 81 calendar in front of me I am sure I could come up with more. I hope there are some things here that help as you travel to Terra Haute. It is very difficult for me to go back and relive these experiences so it has taken me several days to compile this. I type a while, cry a while, type a while and cry some more. You'd think after this long the tears would dry up but they will never dry up--because noone can give me my mom back. I just hope when we finally get Albert prosecuted for these crimes--that we will have some closure and I can cry less often.

I t is very important to me that you keep remembering--Marie was a real person, she was loved, she is missed and we owe it to her to make the people pay who made her and then her family suffer.

*Patti Hammeyer* (signature)



EXHIBIT B

## DOCUMENT REQUESTS

RESPONSE AS TO ALL REQUESTS – SEE DISK AND DOCUMENTS SUPPLEMENTING DISK.

**PRIVILEGE LOG:**

| BATES NO | DATE | ITEM | BASIS |
|---|---|---|---|
| 30003-4 | 3/23/99 | Letter from attorney Jay Clark | Attorney-Client privilege |
| 300013-17 | 11/8/98 | Email Cecil Hurd | Private email among family |
| 300024-25 | 11/30/97 | Email to Cecil Hurd | Relevance; personal family email, no reference to case |
| 300139-143 | 8/22/98 | Email to Cecil Hurd | Private email among family |
| 300144-145 | 8/22/98 | Email to Cecil Hurd | Private email among family |
| 300148-153 | Undated | Notes about case, | Attorney-Client privilege |
| 300154 | Undated | Notes from attorney contact | Attorney-Client privilege |
| | Sept, 2001 | Fee agreement with Gerhardstein | Attorney-Client privilege |
| 300101 | 4/20/98 | Email Jim to Patti | Private email among family |
| 180001-180067 | Various | Jay Clark File | Attorney-Client privilege |

1. Each and every document that you reviewed and/or relied upon in formulating your response to Interrogatory number 1.

2. Each and every document that you reviewed and/or relied upon in formulating your response to Interrogatory number 2.

3. Each and every document that you reviewed and/or relied upon in formulating your



EXHIBIT
C

# RAVERT J. CLARK, ESQ.
114 E. 8th Street
Suite 400
Cincinnati, Ohio 45202
513-587-2887
Fax 513-621-2525

April 14, 2004

Brian E. Hurley, Esq.
30 Garfield Place
Suite 730
Cincinnati, OH 45202

RE: Kammeyer, et al. v. City of Sharonville et al.

Dear Brian:

This comes to address recent events in the above matter. At your request, I have provided copies of my research as well as information I obtained regarding assets and litigation of Albert Schuholz. These items were provided to Randy Freking pursuant to his subpoena. In the event you need me to do any additional research or investigation on your behalf please let me know.

The documents I did not produce in response to Mr. Freking's subpoena consist of March 23, 1999, letters from me to Jim Wright and Lori Miller. I consider these letters to be attorney/client communications and therefore privileged. You may consider this a privilege log on these items.

I have received the subpoena you caused to be served with respect to my deposition. As we discussed when we were selecting a date for my deposition, I have a criminal trial set for April 26, 2004 at 9:00 AM. The case was charged last September, and I have not yet been able to obtain permission from my client to request a continuance of the trial. Having been without full driving privileges since September, there is a very strong probability the client will not permit me to request a continuance. In addition, for many of the same reasons, should my client permit me to request the continuance, there is a strong chance the Judge may not grant the continuance.

I will discharge my professional obligations and responsibilities to former and current clients as well as the Court. I will also take appropriate steps should I begin to feel I am being harassed or unduly burdened as a result of personality conflicts between counsel.

Along this same line, apparently through an inadvertent oversight, I did not receive a check for mileage when served with the deposition subpoena. As an officer of the Court I will appear as required, being mindful of the situation detailed above. I do, however, expect to receive a check. Either before or at the deposition. I do not feel this request is unreasonable, as by my count, all but two of the attorneys involved have offices within walking distance downtown, yet all must drive to Montgomery.

Once I have the opportunity to meet with the client set for trial on April 26, 2004 and have his decision I will advise you accordingly.

Very truly yours,

JAY CLARK
Attorney at law.

CC:  Alphonse Gerhardstein, Esq.
     Randy Freking, Esq.
     Lawrence E. Barbiere, Esq.
     Tom Keating, Esq.

4/14/04


EXHIBIT D

James R. Wright
2676 Willow Lake Drive
Greenwood, IN 46143

March 24, 1997

Lt. Alan A. Hayes
Sharonville Police Dept
10900 Reading Road
Sharonville, Ohio 45241

Dear Lt Hayes:

    Thank you for allowing me to see the testimony in my Mother's case. I was only able to get through half of the first notebook in the 3 hours I had available. I intend to contact you to make arrangements to review the other 2 1/2 notebooks when I get back from a business trip in 2 weeks or so. Due to the time it takes me, I may have to make a couple of appointments to get through it. Besides wanting to express my appreciation, the other purpose of this letter is to share what I have found so far. I will do this each time I stop out and review the testimony. As I do this, please accept what I have to say in the spirit it is being presented. I want Schuholz arrested for the murder of my mother and am trying to see what I can do to help in this. You cannot imagine what it is to live with this being unsolved for 16 years. In reviewing the info I looked at, several things created questions in my mind. Perhaps they are answered later on in the documentation but as far as I got, they created real questions in my mind.

    The first thing I came across was in the beginning of Notebook 1 when the crime scene is being described. A "yellow cloth glove" was found and later fibers from the glove are mentioned. Moving ahead to the first interview with Schuholz, Cramer went to Schuholz's and got a gun from him that was in "a yellow fuzzy cloth glove". Also, in an interview with Perry Baker (page 12) reference is made to a yellow glove and gun again. Speaking from personal experience, I know that Schuholz always used yellow fuzzy work gloves while working. The next point I have a question on is a comment that Cramer makes to Schuholz which is "Al, it's like I told you on the cemetery deal". There is nothing prior to this comment about a cemetery. What is this all about? In the same initial interview, Schuholz is talking about my mother's jewelry and makes reference to "a chest of drawers in her bedroom". Schuholz says in this same interview he was never in my mother's apartment. If so, how did he know there was a chest of drawers in her bedroom? In this same interview, I found it suspicious that the women that Schuholz was using as his alibi ended up in the hospital with a fractured skull and a black eye. Per Schuholz, "She got hit in the face playing softball." I suspect he is half correct. In the second interview with Schuholz, he lays it out for you. He says, "Maybe they were after Marie and they got Starla as an accessory." In fact, this is exactly what happened and the egomaniac part of Schuholz is challenging you. More about that later. The other and more pertinent comment made by Schuholz was that there was "no

3C0005

Schuhz Ex. 7

forcible entry." How did he know that unless he was there? Going to motive, it was pretty obvious why this happened. However, there are comments from a Mr. Bill Burger that addresses motive and as well from Perry Baker testimony (page 4). The anonymous phone call documented after the Karen Cook testimony was made from a woman who lived at 8729 Ashbrook Drive in West Chester at the time. I can't remember her name but I personally spoke to this women at the time of the homicide. Don't know that it is relevant but can get her name if it becomes important. There are other bits and pieces in what I read but nothing more concrete. I am very bothered in that so much of the testimony is missing due to the tape running out of the recorder. This is all throughout the testimony I read.

Lt. Hayes, you indicated that you were going to assign someone to this case now. If possible, I need to give that individual my insight on how to approach and interview Schuholz. Among his many flaws, Schuholz is an egomaniac as previously referenced. There are vulnerable spots that can be attacked that were not in the testimony I saw. I recognize the long odds of ever solving this case. However, justice and my peace of mind can never occur unless we exhaust every avenue. I appreciate your time and attention to this matter. I recognize that the Sharonville Police Department has limited resources and many active crimes to pursue. However, none is as important to me as this one. I will do whatever I can do to assist you and hope what I have presented here is a beginning step to putting Schuholz where he belongs. I will be in contact as soon as I return.

Sincerely,

*Jim Wright*

Jim Wright

cc: Michael Schappa, Chief of Police

3)0006

**RAVERT J. CLARK, ESQ.**
114 E. 8th Street
Suite 400
Cincinnati, Ohio 45202
513-587-2887
Fax 513-621-2525
March 14, 2004


EXHIBIT E

Randy Freking, Esq.
215 East Ninth Street
5th Floor
Cincinnati, OH 45202

    RE:    <u>Kammeyer, et al., v. City of Sharonville, Ohio, et al.</u>

Dear Randy:

    This comes to you along with copies of my file in the above matter, pursuant to the subpoena issued in C-1-01-649. Consistent with our discussion on the issue, did not make copies of the research I completed, primarily on the issue of sovereign immunity and the issues presented by <u>Collins v. Sotka</u>, 81 Ohio St.3d 506 (1998). I also did not make copies of public and court documents relating to assets which may be owned by Albert Schuholz. In the event you would like copies of any of these documents just give me a call. As you directed in your letter of March 4, 2004, I have not produced anything I believe to be privileged.

    As we discussed, in response to a request by Paul Laufman, I caused copies of my file to be made in order to assist in his representation of my former clients. It appears the portions copied for Paul were not returned to the main file and have been mis-filed. I have included a copy of a letter to Paul addressing this issue. Acknowledging my responsibility under the subpoena, if this is not acceptable, please advise how you wish to proceed.

    During our discussions regarding the subpoena, you indicated an interest in any communication I had with Mayor Lovitt. While I am almost positive I sent a demand letter to the Mayor, I cannot locate my file copy of the letter. However, I did locate the notes from my December 2, 1999, telephone conversation with the Mayor, which are included.

    Please let me know if there are any issues unresolved. I look forward to hearing from you in the near future.

                                                        Very truly yours,

                                                        JAY CLARK
                                                        Attorney at law.

C:\WPWIN60\WPDOCS\GHZ.LTR
3 14 04

**RAVERT J. CLARK, ESQ.**
114 E. 8th Street
Suite 400
Cincinnati, Ohio 45202
513-587-2887
Fax 513-621-2525
March 12, 2004

Paul Laufman, Esq.
617 Vine Street
Suite 1409
Cincinnati, OH 45202

    RE:    Schuholz and the City of Sharonville

Dear Paul:

    During a telephone conversation in mid-February, I requested you make copies of any documents I had provided to you on behalf of my former, and your current clients, Patti Kammeyer and Jim Wright. During this conversation, you told me you would provide the copies. You indicated while you may want to make some form of objection to my production of the documents, you would still get the copies to me. To date I have not received any documents from you. I am obligated to respond to a federal subpoena and again request you provide me with copies of all documents I provided to you. Time is of the essence, thus I ask you proved those copies by March 19, 2004.

                                                      Very truly yours,

                                                      JAY CLARK
                                                      Attorney at law.

3/12/04



LAW OFFICES
# Crabbe, Brown & James LLP

30 GARFIELD PLACE
SUITE 740
CINCINNATI, OHIO 45202

TELEPHONE 513.784.1525
FAX 513.784.1250

Email: Bhurley@cbjlawyers.com

www.CBJLawyers.com

ROBERT J. GEHRING+*
BRIAN E. HURLEY

COLUMBUS OFFICE
500 S. FRONT STREET, STE. 1200
COLUMBUS, OHIO 43215
TELEPHONE 614.228.5511
FAX 614.229.4559

+Also Admitted in Kentucky

*Certified Civil Trial Specialist
by National Board of Trial Advocacy

BETH G. WAYNE
WILLIAM C. HICKS

LANCASTER OFFICE
111 S. BROAD STREET, STE. 209
LANCASTER, OHIO 43130
TELEPHONE 740.689.1733
FAX 740.689.1746

URBANA OFFICE
118 SCIOTO STREET
URBANA, OHIO 43078
TELEPHONE 937.652.4000

April 5, 2004

**VIA FACSIMILE**
Alphonse A. Gerhardstein, Esq.
617 Vine Street, Suite 1409
Cincinnati, Ohio 45202

Lawrence E. Barbiere, Esq.
Schroeder, Maundrell, Barbiere & Powers
11935 Mason Road, Suite 110
Cincinnati, Ohio 45249-3703

Thomas T. Keating, Esq.
Keating, Richie & Swick
8050 Hosbrook, Suite 200
Cincinnati, Ohio 45236

Randolph H. Freking, Esq.
Freking & Betz
215 East Ninth Street, 5th Floor
Cincinnati, Ohio 45202

Re: Patricia Kammeyer, et al v. City of Sharonville, et al.
U.S. District Court, Southern District of Ohio, Case No. C-1-01-649

Gentlemen:

Attached find a copy of the Subpoena I served upon Ravert J. Clark for his deposition set for April 26, 2004.

I remain

Very truly yours,

Brian E. Hurley

BEH/ll
cc: Robert J. Gehring, Esq.

\\theserver\firmdocs\NUSS\allcounsel040504.ltr.wpd

Issued by the
# UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

PATRICIA KAMMEYER, et al.

V.

CITY OF SHARONVILLE, et al.

SUBPOENA IN A CIVIL CASE

Case Number:' C-1-01-649

TO: RAVERT J. CLARK, ESQ.
114 East Eighth Street, Suite 400
Cincinnati, Ohio 45202

___ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
| --- | --- |
|  | DATE AND TIME |

XX YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
| --- | --- |
| Schroeder, Maundrell, Barbiere & Powers, Governor's Knoll, Suite 110, 11935 Mason Rd. Cincinnati, Ohio 45249 | April 26, 2004 @ 9:00 a.m. |

XX YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See attachment.

| PLACE | DATE AND TIME |
| --- | --- |
| Schroeder, Maundrell, Barbiere & Powers, Governor's Knoll, Suite 110, 11935 Mason Rd. Cincinnati, Ohio 45249 | April 26, 2004 @ 9:00 a.m. |

___ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
| --- | --- |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) *Brian T Hurley* | DATE 3-30-04 |
| --- | --- |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Brian E. Hurley, Esq. 30 Garfield Place, Ste. 740, Cincinnati, Ohio 45202 (513) 784-1525

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

'If action is pending in district other than district of issuance, state district under case number.

## **ATTACHMENT**

All documents/files that in any way relate to one or more of the following:

1. Patricia Kammeyer
2. James Wright
3. Jan Loraine Miller
4. Sue Ranielle Baker
5. Dale Dorning
6. Albert Schuholz
7. The City of Sharonville, Ohio
8. William Nuss
9. Michael Schappa
10. James Cramer

If you maintain that some or all of the above-referenced documents/files are for any reason protected from discovery, provide a privilege log that, for each withheld document, state the following information:

1. the author(s)
2. the date
3. the recipient(s)
4. a brief statement of the topic(s)
5. a statement of why the document is protected

A088 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | Denise Duncan  3/30/04 | 114 E. 8TH St Cinti OH 4520 |

SERVED ON (PRINT NAME): Denise Duncan

MANNER OF SERVICE: Personal

SERVED BY (PRINT NAME): Beth Wayne

TITLE: Attorney

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on 3/30/04
DATE

SIGNATURE OF SERVER: Beth Wayne

ADDRESS OF SERVER: 30 Garfield Place Ste 740 Cinti, O 452

---

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENA&

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance,

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden

(B) If a subpoena

(i) development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)    DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## Confirmation Report - Memory Send

```
                                    Page       : 001
                                    Date & Time: 04-05-04  11:02am
                                    Line 1     : 5137841250
                                    Machine ID : Crabbe,Brown,James
```

| | | |
|---|---|---|
| Job number | : | 347 |
| Date | : | 04-05  11:00am |
| To | : | ☎3455543 |
| Number of pages | : | 005 |
| Start time | : | 04-05  11:00am |
| End time | : | 04-05  11:02am |
| Pages sent | : | 005 |
| Status | : | OK |
| Job number | : | 347 |

**\*\*\* SEND SUCCESSFUL \*\*\***

---

LAW OFFICES
# Crabbe, Brown & James LLP

30 GARFIELD PLACE
SUITE 740
CINCINNATI, OHIO 45202
TELEPHONE 513.784.1525
FAX 513.784.1250
Email: ROehring@cbjlawyers.com
www.CBJLawyers.com

ROBERT J. GEHRING+~
BRIAN E. HURLEY

COLUMBUS OFFICE
500 S. FRONT STREET, STE. 1200
COLUMBUS, OHIO 43215
TELEPHONE 614.228.5511
FAX 614.229.4559
+Also Admitted in Kentucky
~Certified Civil Trial Specialist
by National Board of Trial Advocacy

SETH C. WAYNE
WILLIAM C. HICKS

LANCASTER OFFICE
111 S. BROAD STREET, STE. 209
LANCASTER, OHIO 43130
TELEPHONE 740.689.1743
FAX 740.689.1746
URBANA OFFICE
119 SCIOTO STREET
URBANA, OHIO 43078
TELEPHONE 937.652.1000

April 5, 2004

## FACSIMILE COVER SHEET

To:  Al Gerhardstein -    345-5543
     Larry Barbiere -     583-4203
     Randy Freking -      651-2570
     Tom Keating -        891-1537

No. of Pages: 5
(Including this cover page)

From:    Brian E. Hurley
         Crabbe, Brown & James LLP

Re:      Kammeyer, et al. v. City of Sharonville, et al.

Message: Please see the attached.

Please call sender at (513) 784-1525 immediately if any pages are not received or are illegible.

The message above and the information contained in the documents transmitted herewith are attorney privileged and confidential information intended only for the person(s) named above. Dissemination, distribution or copying of this communication by anyone other than the person(s) named above is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and return the original message to us via ordinary mail. Thank you.

\\theserver\fbmdocs\HUBB\allenum1.fax.wpd

EXHIBIT
H

LAW OFFICES
# Crabbe, Brown & James LLP

30 GARFIELD PLACE
SUITE 740
CINCINNATI, OHIO 45202

TELEPHONE 513.784.1525
FAX 513.784.1250

Email: Bhurley@cbjlawyers.com

www.CBJLawyers.com

ROBERT J. GEHRING+*
BRIAN E. HURLEY

**COLUMBUS OFFICE**
500 S. FRONT STREET, STE. 1200
COLUMBUS, OHIO 43215
TELEPHONE 614.228.5511
FAX 614.229.4559

+Also Admitted in Kentucky

*Certified Civil Trial Specialist
by National Board of Trial Advocacy

BETH G. WAYNE
WILLIAM C. HICKS

**LANCASTER OFFICE**
111 S. BROAD STREET, STE. 209
LANCASTER, OHIO 43130
TELEPHONE 740.689.1743
FAX 740.689.1746

**URBANA OFFICE**
118 SCIOTO STREET
URBANA, OHIO 43078
TELEPHONE 937.652.4000

April 6, 2004

**VIA FACSIMILE (513) 587-2887** 621-2525

Ravert J. Clark, Esq.
114 East Eighth Street, Suite 400
Cincinnati, Ohio 45202

   Re:   Patricia Kammeyer, et al. v. City of Sharonville, et al.
         U.S. District Court, Southern District of Ohio, Case No. C-1-01-649

Dear Jay:

   In response to the subpoena that Randy Freking had served on you, you withheld all documents that you believe are protected by the attorney-client privilege. That, of course, was appropriate. None of the defense counsel are asking that any document that is truly protected by the privilege be produced. However, as we discussed, in order to assess the assertion of privilege, it is necessary for us to have the following information for each document:

   a.   the date of the document;
   b.   the author(s);
   c.   the recipient(s), including those who were copied with the document; and
   d.   a brief description of the document.

   There is no question that none of the other documents you withheld are protected by the attorney-client privilege and any argument that some of the other documents (i.e. documents relating to the assets of Albert Schuholz and the sovereign immunity research) are otherwise protected is weak. However, to avoid any problems in this regard, I request that for each of those documents you provide the following information:

   a.   the date it was obtained, and
   b.   the source of the document

   Because I will be going out of town on April 9, 2004 if possible I would appreciate it if you provided the requested information by April 8, 2004. Thank you in advance for your cooperation.

Ravert J. Clark, Esq.
April 6, 2004
Page 2

I remain

Very truly yours,

Brian E. Hurley

BEH/ll
cc:  Robert J. Gehring, Esq.
     Tom Keating, Esq.
     Larry Barbiere, Esq.
     Randy Freking, Esq.
     William Nuss

\\theserver\firmdocs\NUSS\clarke040604ltr-LL.wpd