UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PATRICIA KAMMEYER, <u>et</u> <u>al</u>.       :
                                            :    NO. 1:01-CV-00649
          Plaintiffs,              :
                                            :    **ORDER**
                                            :
     v.                            :
                                            :
                                            :
CITY OF SHARONVILLE, OHIO, <u>et</u>  :
<u>al</u>.,                              :
                                            :
          Defendants.              :

          This matter is before the Court on the Joint Motion
of Defendants for Summary Judgment on the Basis that Plaintiffs'
Claims are Barred by Statutes of Limitation (doc. 180), Plaintiffs'
Memorandum in Opposition to Motion of Defendants for Summary
Judgment on the Basis that Plaintiffs' Claims are Barred by the
Statute of Limitations (doc. 187), the Joint Reply Memorandum of
Defendants to Plaintiffs' Memorandum in Opposition to Joint Motion
of Defendants for Summary Judgment (doc. 194), the Joint
Supplemental Reply Memorandum in Support of Joint Motion of
Defendants for Summary Judgment on the Basis that Plaintiffs'
Claims are Barred by Statutes of Limitation (doc. 206), Plaintiffs'
Response on Summary Judgment (doc. 213), and the Joint Reply of
Defendants to Plaintiffs' Response on Summary Judgment (doc. 215).
Additionally, the Court notes that a Hearing was held concerning

Defendants' Joint Motion (doc. 180) on March 24, 2005.

**FACTS & PROCEDURAL HISTORY**

The Defendants in their Joint Motion aptly describe the basic alleged facts of this case in one sentence: "Plaintiffs claim that Defendants were involved in an alleged conspiracy to cover up facts necessary to prosecute Albert Schuholz [(hereinafter "Schuholz")] for the 1981 murders of Marie [Wright] Schuholz [(hereinafter "Wright')] and Starla Burns [(hereinafter "Burns")]." Of course the uncontroverted and alleged facts in this case are significantly more particularized. The following are the facts of this case, as generally alleged by Plaintiffs and as they related to the issue of Defendants' statute of limitations defense. Defendants' version of the facts, as it related to this issue, are more thoroughly noted in the Court's Analysis portion of this Order.

Wright and Burns were murdered in the City of Sharonville, Ohio (hereinafter "Sharonville") on May 8, 1981 (doc. 187). The Plaintiffs in the instant action are the adult children of Wright and Burns (<u>Id</u>.). In total, four adult children of Wright and Burns constitute the Plaintiffs (<u>Id</u>.). Each Plaintiff resided outside of the greater Cincinnati area at the time of the murders and have remained situated as such since the murders (<u>Id</u>.).

Plaintiffs maintain that extensive evidence points to Schuholz as the culprit (<u>Id</u>.). This extensive evidence,

assert the Plaintiffs, consists of:

> (1) Wright and Schuholz were engaged in an acrimonious divorce at the time of the murders;

> (2) Wright hired detectives to follow Schuholz to document his affair with another woman, Audrey Stevens (hereinafter "Stevens");

> (3) Schuholz forged Wright's name on a separation agreement favoring Schuholz in the division of his and Wright's marital property;

> (4) immediately prior to the murders, proof of the forgery was emerging through expert reports including an expert hired by Schuholz's attorney;

> (5) several police reports were filed before the murders reflecting complaints made by Wright regarding violence directed toward her, including death threats made against her by Schuholz;

> (6) one of these police reports, taken by Sharonville police officer Alan Hayes two months prior to Wright's murder, clearly indicated Wright's fear that Schuholz intended to kill her;

> (7) another police report, filed in January 1981, revealed that Schuholz attempted to hire Perry Baker to kill Wright;

> (8) several attorneys, including Wright's Attorney, Ed Utz (hereinafter "Utz"), came to the Sharonville Police Department (hereinafter "SPD") within hours of the muders and related detailed facts about the efforts of Schuholz to hire individuals to kill Wright;

> (9) Wright's children, Plaintiffs in this action, also provided specifics to the SPD regarding the history of abuse prevalent in Wright and Schuholz's marriage;

> (10) at Wright's grave just days after the murder Schuholz approached Jim Wright,

Wright's son, and commented, "I got her and I will get the rest;"

(11) Wright's best friend, Karen Cook, was reportedly also threatened with death for testifying in favor of Wright at the divorce proceedings; and

(12) presumably Schuholz relied on "vague" alibi statements from Stevens at the time of the murder to whom Schuholz paid $25,000.00 the month following the murder.

(<u>Id</u>.). Plaintiffs maintain that at the time of and since the murders they have always been supportive of the SPD's efforts in investigating the murders (<u>Id</u>.).

Plaintiffs aver that for many years they lived in fear of Schuholz (<u>Id</u>.). Jim Wright maintains that Schuholz directly threatened his life (<u>Id</u>.). Patricia Kammeyer (hereinafter "Kammeyer"), daughter of Wright, maintains that Schuholz threatened her in the past as a means of asserting control over Wright (<u>Id</u>.). Plaintiffs called and wrote to the SPD regularly during the initial investigation of the murders (<u>Id</u>.).

What is hotly disputed in this action is the claim by Plaintiffs that Defendants have lied and pursued a cover-up that has continued to the present day (<u>Id</u>.). Jim Cramer (hereinafter "Cramer") was the lead detective for the SPD (<u>Id</u>.). Cramer was responsible for felony investigations, including the murders of Wright and Burns (<u>Id</u>.). Cramer, during his time as lead detective,

occasionally reported to the Chief, William Nuss (hereinafter "Nuss") as he deemed necessary (Id.). Plaintiffs maintain that no formal system was in place at the SPD to audit the status of open cases or to check on the progress of ongoing investigations (Id.). The Chief had the ultimate responsibility for the murder of investigation of Wright and Burns, but Cramer handled the day-to-day management of said investigation (Id.). Nuss was Cramer's brother-in-law (Id.).

Plaintiffs aver that during the investigation of the murders, Cramer had a pattern of failing to return phone calls (Id.). Plaintiffs claim he showed little compassion for the victims of the murder and failed to deal justly with suspects as well as failed to communicate with other officers in the department concerning the investigation (Id.). Plaintiffs assert that this lack of compassion coupled with the above mentioned failures harmed the quality of the investigation (Id.). Additionally, Plaintiffs avow that Nuss ignored these problems and allowed them to worsen (Id.). On September 26, 1988, the entire SPD command staff, including Lieutenant (now Chief) Mike Schappa (hereinafter "Schappa"), wrote a letter to Nuss which stated, "the below signed Sharonville Police Personnel submit to you the primary immediate problem within the department: Lieutenant James Cramer" (Id.). Subsequently, Sharonville conducted an investigation; Cramer was removed of his duties as lead detective and was replaced by Greg

-5-

Homer (hereinafter "Homer") (<u>Id</u>.).  Ultimately, on May 15, 1990, Cramer resigned from the SPD (<u>Id</u>.).  Plaintiffs profess that Cramer moved to Indiana after his investigation and has resided in Indiana ever since (<u>Id</u>.).

Cramer never secured an indictment of Schuholz (<u>Id</u>.).  Cramer, in deposition, stated that he advised the Plaintiffs that in not securing an indictment he was merely following the advice of the Hamilton County Prosecutor (<u>Id</u>.). According to Plaintiffs and Cramer, in 1981 Cramer presented the case files to then Hamilton County Prosecutor Simon Leis (hereinafter "Leis") as well as one or more assistants of Leis whereupon he was advised that there was not sufficient evidence to proceed (<u>Id</u>.).

Plaintiffs maintain no documentation exists in the SPD murder investigation file that reflects this meeting between Cramer and Leis (<u>Id</u>.).  Plaintiffs, however, argue that some contact between Cramer and Leis took place (<u>Id</u>.).  In support of this claim, Plaintiffs point to a letter dated April 18, 1983 from Utz (<u>Id</u>.).  The letter purportedly indicates that Leis (who was in 1983 a common pleas judge) recused himself from two cases filed by the estate because of "his involvement and participation in the criminal investigation of the death of Marie Schuholz [Wright]" (<u>Id</u>.).  Utz is now deceased (<u>Id</u>.).  Additionally, Plaintiffs

maintain that Schappa told Kammeyer that Cramer had met with Leis (<u>Id</u>.).

In 1997, Detective Dale Dorning (hereinafter "Dorning") of the SPD reopened the murder investigation (<u>Id</u>.). In 1999, through the efforts of this investigation, a indictment was secured against Schuholz (<u>Id</u>.). Plaintiffs claim that Dorning re-interviewed many of the persons that had contacted Cramer sixteen years earlier about the murders or persons that were identified in the case file, presented an accurate summary of his information to the prosecutor, and, subsequently, secured the indictment based substantially on the same evidence that was available in 1981 (<u>Id</u>.).

Plaintiffs argue that Dorning raises serious questions about whether in 1981 Cramer accurately relayed the evidence to the Hamilton County Prosecutor and his assistants concerning the murder (<u>Id</u>.). To sustain this assertion, Plaintiffs highlight portions of Dorning's deposition in which Dorning asserts that Cramer told him that indeed he (Cramer) had met with the Prosecutor in 1981 (<u>Id</u>.). During this meeting, according to Dorning's deposition, Cramer maintains he recited certain information to the Prosecutor which presumably would have led the Prosecutor to indict Schuholz, yet the Prosecutor maintains that had the information now available actually been known by the Prosecutor's office an indictment surely would have occurred (<u>Id</u>.).

Plaintiffs argue that the evidence in 1981 implicating Schuholz was so overwhelming that this evidence, itself, points to Cramer misleading the Prosecutor (Id.).  Plaintiffs assert that at all times relevant to the murder investigation, they were led to believe that Cramer was acting consistent with the advice of the Hamilton County Prosecutor (Id.).

Plaintiffs maintain, citing Homer's deposition, that when Homer replaced Cramer as lead detective a comprehensive review of the murder investigation's status was not completed (Id.).  Furthermore, according to Homer's deposition, he did not actively work the case (Id.).  In 1990, Nuss resigned as Chief and was replaced by Schappa (Id.).  At this time, according to Schappa's deposition, a review of the Wright and Burns murder investigation was not conducted (Id.).  No evidence, according to Plaintiffs, exists showing contact between the SPD and the Hamilton County Prosecutor's Office (hereinafter "HCPO") during this time; as a result Plaintiffs insist the investigation was "cold" (Id.).  This activity, or inactivity as Plaintiffs describe it, occurred during the years 1989-1997 (Id.).

During the years 1997 to 2000, Dorning's activities revolving around the investigation commenced and information was shared with the Plaintiffs (Id.).  This activity began with a request by Jim Wright to access the investigative file (Id.).  According to Jim Wright, he had grown frustrated with the

inactivity and was hoping to read the file and suggest to the investigators a course of action (<u>Id</u>.). Jim Wright avers that he was permitted to read three "binders" of information (<u>Id</u>.). Jim Wright indicates that after reading the material the first time he wrote a letter summarizing some of his observations (<u>Id</u>.). Sometime after the writing of this letter, Dorning was assigned to the case (<u>Id</u>.). Dorning, viewing Cramer's work on the case as suspect, criminally investigated Cramer for his part in the case (<u>Id</u>.). Dorning communicated with the Plaintiffs during this time about certain details of the investigation (<u>Id</u>.). Dorning, in his deposition, notes that this behavior of sharing information was approved by Schappa (<u>Id</u>.).

As noted above, ultimately in 1999 Schuholz was indicted for the murders of Wright and Burns (<u>Id</u>.). This indictment was announced by the Hamilton County Prosecutor at a press conference on November 12, 1999 (<u>Id</u>.). According to Plaintiffs, at the time of the 1999 indictment, Schappa told Kammeyer that he had "learned in the past few years about your case and the dirty cop" and that the Wright murder investigation was delayed by a "cover-up" (<u>Id</u>.). Additionally, according to the deposition of Kammeyer, Schappa told her that she along with her brother Jim Wright had been "lied to from the beginning" (<u>Id</u>.).

Plaintiffs assert that the cover-up has continued from 2000 to the present (<u>Id</u>.). Evidence of this continued cover-

up consists of the following.  In 1999, the Plaintiffs retained Jay Clark (hereinafter "Clark") as their counsel (Id.).  Plaintiffs maintain that their intent in retaining Clark was to proceed with any litigation that was appropriate after Schuholz was convicted (Id.).  On April 7, 2000 the Plaintiffs learned that Schuholz had been found incompetent in another federal prosecution (Id.).  This additional prosecution involved the attempted murder of a subsequent wife of Schuholz's in 1998 (Id.).  Schuholz pleaded guilty to this attempted murder but was declared incompetent prior to sentencing in that case.  See United States v. Albert Schuholz, Case No. 98-CR-68 (E.D. KY 1998).  This declaration of incompetency, unfortunately, made the prosecution of Schuholz for Wright and Burns's murders less likely (Id.).

Plaintiffs aver that once Clark was retained and it was made known to Sharonville that Clark would be representing the Plaintiffs for any potential claims arising from the murder and the murder investigation, Sharonville ceased cooperating with them (Id.).  Dorning retained Clark as well to represent him regarding Dorning's employment with Sharonville (Id.).  Clark declared that Dorning was being pressured by Sharonville because Dorning had uncovered misconduct by Sharonville employees (Id.).  Clark sent a letter to the Sharonville Law Director, Tom Keating (hereinafter "Keating"), in July 2000, indicating Dorning's employment situation - namely, that Dorning felt pressure due to Sharonville's

uneasiness concerning Dorning's investigation into the Schuholz murder case and the misconduct discovered (Id.). Plaintiffs state that in response to this letter Keating reacted with surprise that Clark knew of the allegations of misconduct and requested that Dorning not reveal any further information (Id.). In Keating's return letter, he stated that "[n]o wrongdoing has ever been alleged against a current member of the Department" (Id.). As such, the Plaintiffs maintain the cover-up continued (Id.).

In 2001, Plaintiffs retained new counsel, Alphonse A. Gerhardstein (hereinafter "Gehardstein") and Paul M. Laufman, who currently remain as counsel for Plaintiffs (Id.). On May 25, 2001 Gehardstein requested access to the investigative file (Id.). On June 5, 2001, Gehardstein asserts that Schappa denied access because the file was part of an ongoing investigation (Id.). On January 14, 2002, after this instant action was filed, Sharonville attorney Larry Barbiere again denied Gehardstein access to the file (Id.). Eventually, Plaintiffs filed a Motion to Compel, which this Court granted (doc. 40). Additional and more complete access to the file was Ordered by the Court (doc. 64).

Plaintiffs, as a result of information revealed in Cramer's deposition, maintain that material is missing from the investigative file - specifically, according to Cramer, the following: supplemental case reports; audiotapes of witness interviews, and all notes and tapes of his interview of Schuholz in

June 1981 (Id.).  Dorning agrees that the audiotapes of the 1981 interviews are indeed missing (Id.).  Schappa has indicated that he is not certain that the investigative file is complete (Id.).  Officially Sharonville ultimately admitted that the audiotapes of interviews conducted prior to 1997 and all records of the Cramer interview of Schuholz are missing (Id.).

Plaintiffs note that Schappa now denies ever telling Kammeyer that she had been lied to during the investigation and that a dirty copy had thwarted the investigation (Id.).  Additionally, Sharonville, despite its criminal investigation of Cramer's conduct, now asserts that Cramer followed all city policies in the investigation and did nothing wrong (Id.).  All of the above, maintain Plaintiffs, signifies the continued cover-up from 2000 to the present (Id.).

The facts, as detailed above, are long, detailed, and complicated.  The procedural history in this matter is no different.  This matter has been on the Court's docket since September 25, 2001 when Plaintiffs filed their initial Complaint (doc. 1).  Three Amended Complaints have subsequently been filed (docs. 2, 45, and 119).  Discovery has been nothing less than rancourous, as the Parties have filed numerous Motions to Compel and Motions to Quash.  The Court's Orders pertaining to discovery matters as well as other issues have been appealed to the Sixth Circuit.  Defendants have filed Motions to Dismiss, which the Court

-12-

has denied.  Now, the Defendants have filed their current, Joint Motion for Summary Judgment based on Statute of Limitations (doc. 180).  The Defendants have also filed several Motions for Summary Judgment on substantive issues, which the Court will address in a subsequent Order.  The matter is set for Trial to begin May 10, 2005.

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. See id. at 321; Guarino v. Brookfield Township Trustees, 980 F.2d 399, 405 (6th Cir. 1992); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party

"must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); see Guarino, 980 F.2d at 405.

As the Supreme Court stated in Celotex, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324; Guarino, 980 F.2d at 405.  Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" Guarino, 980 F.2d at 405, quoting Inter-Royal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. See McDonald v. Union Camp Corp., 898 F.2d 1155, 1162 (6th Cir. 1990).  Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary judgment is appropriate. See Guarino, 980 F.2d at 410; Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991).

**ANALYSIS**

The Defendants, Sharonville, Nuss, Schappa, and Cramer (hereinafter collectively "Defendants"), move the Court to

-14-

enter judgment in their favor because Plaintiffs' claims are barred by the applicable statute of limitation (doc. 180).  In support of their position, Defendants note that Jim Wright, on April 11, 2000, stated, ". . . [S]uing Sharonville and winning the case is going to be difficult at best due to the statute of limitations" (Id.). Defendants claim that Jim Wright was almost but not quite correct (Id.).  Defendants' position is that this Case is *impossible* to win because of the applicable statute of limitation (Id.).

Defendants state that each of Plaintiffs' four claims is based on the alleged cover-up (Id.).  Defendants maintain that Plaintiffs' claims are time barred because they were in possession of sufficient information relating to the alleged cover-up more than two years prior to September 25, 2001 (Id.).  Each claim in this matter, according to Defendants, is governed by a two-year statute of limitation (Id.).

Defendants make the following factual assertions to support this argument (Id.).  It is clear, from the list of factual assertions below, that Defendants take a somewhat different view of the facts than as alleged by the Plaintiffs and recited in the Court's factual section above.  The Parties' divergent views concerning the facts clearly indicates that factual issues remain paramount in this case.

> 1.    Kammeyer and Jim Wright state they knew
>        on May 8, 1981 - the day of the murders -
>        that Schuholz had murdered or hired to
>        murder their mother;

-15-

2.    Within two weeks after the murders, Kammeyer and Jim Wright had many questions about the manner in which Cramer was handling the murder investigation;

3.    By July 1981, Kammeyer and Jim Wright and their family began to suspect a dirty cop and state they always knew that somehow Cramer was involved in a cover up;

4.    By July 1981, Kammeyer and Jim Wright and their family began to speculate that somebody had taken a payoff;

5.    Plaintiff Lori Miller (hereinafter "Miller") admits that by 1999 she suspected for a long time that there was something wrong with the way the SPD was handling the murder investigation;

6.    Nuss was the SPD Chief of Police in 1981, and Cramer was the SPD detective placed in charge of the murder investigation. Both had left the SPD by 1991, and, as such, could not have done anything to further the alleged cover-up after that date;

7.    In 1996 Dorning was given full authority and unfettered discretion by then and current SPD Chief Schappa to investigate the murders and the alleged cover-up of Schuholz's role in the murders. Sharonville placed no limitations on Dorning, and it gave Dorning full support in connection with the investigation. This led to Dorning, also with the full support of SPD, to contact the HCPO to see if criminal charges could be brought against Cramer.  As such, any alleged cover-up ended no later than 1996;

8.    Beginning in 1997, Plaintiffs had full access to all of the information and evidence known by the SPD (i.e., "the means of knowledge") relating to the

-16-

murders and alleged cover-up, including the SPD's entire investigation file. In addition, Plaintiffs were given full access to Dorning, who at all times kept them up to date about the status of his investigations and was always open and honest with them;

9.  Within a short time after Dorning had thought that Cramer was involved in a cover-up, Dorning informed Jim Wright and Kammeyer of his thoughts in this regard. That was probably in 1997, but no later than 1998;

10. In early November, 1998, Kammeyer stated in writing that since 1981 her family knew that Cramer was a dirty cop, was involved in cover-up, was on the take, and was protecting Schuholz. Further, Kammeyer stated that Cramer had caused her and her family great harm, and she threatened to bring a civil lawsuit to financially ruin Cramer. Jim Wright was fully aware at that time of each of these allegations made by Kammeyer, as well as the many "facts" Kammeyer listed in support of her allegations;

11. Prior to his first interview with Cramer, Dorning told Jim Wright and Kammeyer about his suspicions of how Cramer had conducted the murder investigation;

12. On November 16, 1998, Dorning conducted his first interview of Cramer. Shortly thereafter, Dorning told Jim Wright and Kammeyer what he had learned during the interview. Dorning also informed Jim Wright and Kammeyer that he thought the manner in which Cramer conducted the murder investigation was "intentionally wrong;"

13. In late 1998, Dorning conducted his second interview of Cramer. As a result of that interview, Dorning concluded that Cramer had been involved in a cover-up,

-17-

and he communicated this to Kammeyer and Jim Wright at that time;

14.  In 1997, Dorning also was in contact with Miller about his investigation, and in late 1998 told her of his conclusion that Cramer had intentionally mishandled the murder investigation. Miller shared this information with her sister, Plaintiff Ranie Baker (hereinafter "Baker");

15.  Miller admits that long before 1999 she suspected Cramer had conducted the murder investigation in an improper manner;

16.  In March 1999, Plaintiffs communicated and met with Clark, and by April 1999 they had retained him to pursue claims against Sharonville and its employees. In fact, in April 1999, Jim Wright, for himself, Kammeyer, and the Estate of Wright, informed Clark that he looked forward to Clark bringing his suit against Sharonville in an expeditious manner;

17.  Clark admits that he was retained by Plaintiffs to represent them "with respect to pursuing any available claims" relating to the homicides;

18.  On April 30, 1999, Schuholz was indicted on four counts of murder;

19.  In July 1999, Kammeyer and the Estate's administrator, Cecil Hurd (hereinafter "Hurd"), met with Clark, and they discussed bringing a lawsuit against Sharonville, and identified certain Sharonville employees (including Cramer and Nuss) who might also be defendants in that lawsuit. By letter, Clark confirmed that his representation with respect to the claims against Sharonville were in addition to the claims against [Schuholz] and others involved in [Wright's] death;

20.  During the summer of 1999, Clark

-18-

contacted Sharonville on behalf of the Plaintiffs to discuss their claims against Sharonville and attempt to negotiate the possible settlement of the same claims Plaintiffs have made in this action;

21.  In May 2001, Jim Wright contacted their current counsel to represent Plaintiffs in connection with precisely the same claims for which they had retained Clark more than two years earlier. In September 2001, Plaintiffs retained their current counsel for that purpose; and

22.  Plaintiffs commenced this litigation on September 25, 2001 and all of their pending claims are based on the alleged cover-up by Cramer and possibly others.

(Id.). It is these factual assertions that serve as the backbone of the Defendants' statute of limitation defense.

Defendants cite the United States Supreme Court case, Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147 (1984), for the proposition that a court should not ignore a statute of limitation defense based merely "out of vague sympathy" for the plaintiffs. Id. at 152. Furthermore, Defendants note that the Supreme Court has held that in Section 1983 actions, the focus for statute of limitation purposes is on the time of the bad act, not when the act causes the most pain. Chadron v. Fernandez, 454 U.S. 6, 8 (1981), reh'g denied, 454 U.S. 1166 (1982); citing Delaware State College v. Ricks, 449 U.S. 250, 258 (1980).

As noted above, Defendants maintain that the statute

of limitation for each of Plaintiffs' four claims is two years (doc. 180). Defendants maintain that for section 1983 claims federal courts apply the relevant state statute of limitation to determine whether an action is timely filed (doc. 180 citing Wilson v. Garcia, 471 U.S. 261, 268-69 (1985). Ohio Revised Code § 2305.10 governs 1983 claims and provides for a two year statute of limitation. Id. The Sixth Circuit, point out Defendants, has held that for section 1983 claims the statute of limitation period begins to run when the plaintiff knows or has reason to know the operative facts that form the basis of the claim. Friedman v. Estate of Presser, 929 F.2d 1151, 1159 (6th Cir. 1991) citing Sevier v. Turner, 742 F.2d 262, 273 (6th Cir. 1984). As to Plaintiffs' state law claims, Defendants aptly cite section 2744.04(A) of the Ohio Revised Code which states that a claim brought against a political subdivision and its employees "shall be brought within two years after the cause of action accrues." Ohio Rev. Code § 2744.04(A); Gnezda v. City of North Royalton, 2004 WL 637781 (Ohio App. April 1, 2004).

Defendants illustrate two possible moments in time where a plaintiff's section 1983 claim accrues (doc. 180). First, the "actual knowledge" test, which provides:

> . . . the relevant knowledge for triggering the statute of limitations is knowledge of the facts or transaction that constituted the alleged violation. Consequently, it is not necessary for a potential plaintiff to have knowledge of every last detail of a

transaction, or knowledge of its illegality.

Million v. Trustees of Central States, Souteast & Southwest Areas Pension Fund, 2002 WL 31412401 *3 (Oct. 24, 2002 6th Cir. 2002) citing Martin v. Consultants & Adm'rs, Inc., 996 F.2d 1078, 1086 (7th Cir. 1992). Second, the "excites suspicion" test, which holds that where a plaintiff is aware of facts sufficient to excite suspicion and has had available to him the means of knowledge, the statute of limitations will accrue. Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975). Dayco Corp. states: "any fact that should excite suspicion is the same as actual knowledge [of the plaintiff's] entire claim. Indeed, the means of knowledge are the same thing as knowledge itself." Id. (internal citations omitted).

Defendants maintain, citing Farrel v. Auto. Club of Michigan, 870 F.2d 1129 (6th Cir. 1989), that a plaintiff has the means of knowledge available when he has reviewed and discussed the documents allegedly proving his claim (doc. 180 citing Farrel at 1131-32). Defendants argue that Wright's review of SPD's file and discussion of the contents of that file constitutes the means of knowledge as indicated in Farrel (Id.). Additionally, Defendants assert that the means of knowledge is present where a plaintiff has retained legal counsel who recognizes the plaintiff's potential claims (Id. citing Leong v. Potter, 347 F.3d 1117, 1123 (9th Cir.

2003) (<u>internal</u> <u>citations</u> <u>omitted</u>); <u>see</u> <u>also</u> <u>Steiner v. Henderson</u>, 354 F.3d 432, 436 (6th Cir. 2003).

Defendants aver that when a plaintiff in a 1983 action alleges a conspiracy, the limitations period begins to accrue at the moment that plaintiff knew or reasonably should have known of the wrongful acts taken in furtherance of the conspiracy (doc. 180). It is the date of the last overt act in furtherance of the conspiracy that is the key date, note Defendants (doc. 180). Defendants cite the Sixth Circuit case of <u>Peck v. General Motors Corp.</u>, 894 F.2d 844 (6th Cir. 1990), which states:

> . . . when a plaintiff alleges a continuing violation, an overt act by the defendant is required to restart the statute of limitations and the statute runs from the last overt act . . . . [f]or statute of limitations purposes, therefore, the focus is on the timing of the causes of injury, i.e., the defendant's overt acts, as opposed to the effects of the overt acts.

<u>Id</u>. at 849, <u>quoting</u> <u>Pace Indust., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 237 (9th Cir. 1987). <u>Pace</u> illuminates what constitutes an overt act sufficient to restart the running of the statute - (1) it must "be a new and independent act that is not merely a reaffirmation of a previous act" and (2) it must "inflict new and accumulating injury on the plaintiff." <u>Pace</u> at 238. Additionally, Defendants cite <u>DXS, Inc. v. Siemens Med. Sys., Inc.</u>, 100 F.3d 462 (6th Cir. 1996) which held that "acts that simply reflect or

implement a prior refusal to deal . . . do not restart the statute of limitations." <u>Id</u>. at 467.

Given the factual allegations as asserted in the Defendants' Motion for Summary Judgment and the applicable law discussed above, the Defendants conclude that Plaintiffs' claims are time barred (doc. 180). Defendants maintain that this is true because Plaintiffs knew or had reason to know of the operative facts supporting their claims prior to September 25, 1999 (<u>Id</u>.). Defendants argue that Plaintiffs had knowledge based facts which "excited their suspicions" about and "the means of knowledge" to alert them to their claims at a much earlier date.

Plaintiffs, obviously, argue that the statute of limitations does not bar their claims (doc. 187). The Court notes that Defendants have aptly analyzed the holding in <u>Pace</u> and <u>Peck</u> and which provides one method of tolling the statute of limitations as it pertains to Plaintiffs' federal claim - that being the ongoing conspiracy doctrine. Plaintiffs have set forth material issues of fact that Defendants have engaged in an ongoing conspiracy. Overt acts have been alleged since 2000 that (1) are new and independent and (2) inflict new and accumulating injury on the Plaintiffs. <u>Pace</u> at 238. The Court discusses these continued overt acts below when addressing the applicability of the equitable tolling doctrine to Plaintiffs' claims.

Turning to equitable tolling doctrine, the Court

notes that Plaintiffs cite the case of <u>Bell v. City of Milwaukee</u>, 746 F.2d 1205 (7th Cir. 1984) for the argument that this Court should recognize equitable principles and toll the running of the statute in this matter (doc. 187). The Court finds the rationale concerning equitable tolling espoused in <u>Bell</u> helpful in reaching a determination of the instant matter. In <u>Bell</u> the defendants, members of the Milwaukee Police Department, covered up the facts of police misconduct that resulted in the death of Daniel Bell. <u>Bell</u> at 1214-24. Due to this cover-up, the family of Daniel Bell was delayed for over twenty years in filing a civil rights claim against the City of Milwaukee and specific police officers. <u>Id</u>. Some facts in <u>Bell</u> are quite similar to those found in the instant matter.

In <u>Bell</u> the plaintiffs always suspected a cover-up and, in fact, instituted a state court action against the defendants for wrongful death in 1960 - over twenty years before plaintiffs filed their federal suit before the Seventh Circuit. <u>Bell</u> at 1222. Clearly, the plaintiffs' suspicions in <u>Bell</u> were excited at an early stage in the cover-up. In 1978, a police officer acutely involved in the death and cover-up of Daniel Bell, informed the then district attorney that police misconduct had occurred in both the death of Daniel Bell and in the subsequent cover-up. <u>Id</u>. at 1223. On August 29, 1979, the primary police officer involved in Daniel Bell's wrongful death and also involved

in the subsequent cover-up pleaded guilty to homicide by reckless conduct and perjury in connection with an inquest into the matter that occurred some twenty years earlier.  <u>Id</u>.  The plaintiffs in <u>Bell</u> instituted their federal action in October 1979.  <u>Id</u>. at 1224.

Defendants in <u>Bell</u> raised a statute of limitations defense, just as Defendants have done here.  <u>Id</u>.  The Seventh Circuit in <u>Bell</u> addressing the statute of limitations defense, referenced heavily the district court's opinion.  <u>Id</u>. at 1229.  In so doing, the Seventh Circuit noted ". . . a defendant is estopped from pleading the statute of limitations where his own fraudulent conduct has prevented the plaintiff from filing suit within the applicable time period."  <u>Id</u>. (<u>internal</u> <u>citations</u> <u>omitted</u>). Additionally, the <u>Bell</u> court stated, "[i]f the jury finds these allegations [of cover-up] to be true, the defendants will be estopped from arguing that the claims . . . are time barred."  <u>Id</u>.

The <u>Bell</u> court discussed in detail the equitable tolling doctrine of fraudulent concealment.  <u>Id</u>.  The doctrine of fraudulent concealment has been recognized by the Sixth Circuit. <u>See</u> <u>e.g.</u>, <u>Hill v. U.S. Dep't of Labor</u>, 65 F.3d 1331 (6th Cir. 1995). To avoid a defense of statute of limitations based on a traditional fraudulent concealment argument, a plaintiff must show: (1) that defendants wrongfully concealed their actions; (2) that plaintiff failed to discover the operative facts that form the basis of his

cause of action within the applicable time limit; and (3) that plaintiff exercised due diligence in discovering the operative facts. Id. at 1336. Under Wisconsin law, which applied in the Bell case, the elements necessary to prove fraudulent concealment are not stated exactly as in Hill, but are in substance the same. Bell at 1229-30. Defendants in Bell, at the summary judgment stage, argued that the plaintiffs did not meet one of the elements necessary to prove fraudulent concealment. Id. at 1230.

However, the Seventh Circuit held that a strict application of the elements was not necessary. Id. at 1230-31. The Seventh Circuit stated:

> . . . [T]he Court is not persuaded by the defendants' argument that the six enumerated rules [(to prove fraudulent concealment)] in Boehm constitute the applicable and binding state tolling rule of law, because their interpretation of the Boehm case and the nature and scope of a court's equity powers is exceedingly restrictive. Equitable estoppel, including equitable estoppel by fraudulent concealment, is pre-eminently the creature of equity, recognized by the common law at a very early day.

Id. at 1230 (internal citations omitted). Bell continued noting that the applicable rule should be:

> [N]ot whether . . . [the requirements of fraudulent concealment are] precisely met, but [should be] whether defendants' conduct and representations were so unfair and misleading as to outbalance the public's interest in setting a limitation on an action and thus carve an exception for that action out of the statute of limitation.

-26-

Id. at 1231.

Ultimately, the Seventh Circuit held that if the allegations of the cover-up are true and were "designed to conceal" the misconduct of the police officers then they "are allegations of conduct so unfair, misleading, and outrageous as to outbalance the public's interest" in applying the applicable statute of limitations. Id. Additionally the court noted that one of the primary policies behind a statute of limitation is to "preclude litigation involving lost evidence or distorted testimony of witnesses whose memories have faded." Id. However, the court found that this policy was not violated despite the deaths of three important witnesses. Id.

Defendants counter that Plaintiffs' reliance on Bell is misplaced and, in fact, that Bell works in their favor (doc. 194). First, Defendants assert that in Bell the decedent was shot and killed by one of the defendants; here, Defendants assert they had absolutely nothing to do with the murders (Id.). Second, Defendants note that the police officer who shot the decedent in Bell and his partner concocted a story to justify the shooting, a conspiracy they maintained for over twenty years (Id.). Defendants maintain that no evidence exists that they were involved in a conspiracy (Id.). Third, Defendants note that in Bell one of the plaintiffs, the decedent's father, brought a cause of action promptly, within the statute of limitations (Id.). Fourth,

Defendants argue, that in <u>Bell</u> the father participated in a settlement (<u>Id</u>.).  Fifth, Defendants highlight that in <u>Bell</u> a participant in the conspiracy actually confessed (<u>Id</u>.).  This, argue Defendants, is the linchpin of the Seventh Circuit's decision to permit plaintiffs to bring the action some twenty years later (<u>Id</u>.).  Defendants point out that no admission on the part of any Defendant has been given to support Plaintiffs' theory of a conspiracy (<u>Id</u>.).  Lastly, Defendants note that the plaintiffs in <u>Bell</u> commenced their litigation within months after being told of the conspiracy (<u>Id</u>.).  In short, maintain Defendants, the plaintiffs in <u>Bell</u> did bring their claim within the statute of limitations (<u>Id</u>.).  Here, argue Defendants, Plaintiffs waited over twenty years to bring their claim despite the Defendants' assertion that Plaintiffs knew of the conspiracy and, also, waited over two years to bring their claim after learning Dorning's belief that indeed a cover-up had taken place (<u>Id</u>.).

However, the Court is not persuaded by the Defendants' distinctions.  <u>Bell</u> developed a general rule, not a rule to be applied only to cases with nearly identical factual scenarios and procedural postures.  <u>Bell</u> stood for the creation of a policy against "conduct and representations . . . so unfair and misleading as to outbalance the public's interest in setting a limitation on an action and thus carve an exception for that action out of the statute of limitation."  <u>Bell</u> at 1231.

The Court in <u>Bell</u> used its equitable powers to aid in remedying an injustice.  It did not apply a strict approach to the fraudulent concealment analysis because the facts led to the presumption that indeed a cover-up had occurred.  The Court actually finds, counter to Defendants' argument, that the absence of an admission of the conspiracy by any one Defendant renders the invocation of the holding in <u>Bell</u> more necessary.  The Court is fairly certain that such an admission will never occur.  Without equitable tolling, Plaintiffs would be left with the untenable position of never being able to vindicate their rights. Presumably, the alleged cover-up will continue until no one is left to care that a police department and its representatives allegedly, purposefully misconducted a murder investigation and then conspired to cover-up that misconduct.

As Plaintiffs note, Defendants are in control of the knowledge necessary to expose the cover-up and will continue to be so.  Without a trial, light will never be shed upon this alleged cover-up.  Certainly, the interests of the public are better served by tolling the applicable statute of limitations than they are by permitting an egregious set of circumstances conducted by public officials, if proven true, to go unchecked.  Law enforcement officials are supposed to serve the interests of the public, not purposefully work against those interests.

As to Plaintiffs' state law claims, Ohio courts have

recognized the doctrine of equitable tolling or equitable estoppel as they more readily name it.  <u>See</u> <u>e.g.</u>, <u>Powers v. Pinkerton Inc.</u>, 2001 WL 60035 (Ohio App. 8th Dist., Jan. 18, 2001); <u>Bossey v. Al Castrucci Inc.</u>, 664 N.E.2d 1301, 1303 (Ohio App. 1995); <u>Creaturo v. Duko</u>, 2005 WL 678513 (Ohio App. 7th Dist., Mar. 14, 2005); <u>Luft v. Perry County Lumber & Supply Co.</u>, 2003 WL 21027291 (Ohio App. 10th Dist., May 8, 2003).  The doctrine of equitable estoppel as it applies to the statute of limitations in Ohio requires: (1) that the defendant made a factual misrepresentation; (2) that it was misleading; (3) that it induced actual reliance which is reasonable and in good faith; and (4) that it caused detriment to the relying party.  <u>Id</u>.  These requirements are different than those required to benefit from equitable tolling in federal causes of action (see above).  However, when applying the alleged material facts discussed by the Court below to the above four elements, it is also clear that equitable tolling or equitable estoppel is available for both the Plaintiffs' state law claims.

The Supreme Court has noted in <u>Burnett v. New York Cent. R. Co.</u>, 380 U.S. 424:

> Statutes of limitations are primarily designed to assure fairness to defendants.  Such statutes promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.  The theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them.

Id. at 428.  Yet, the Burnett Court also noted, "[t]his policy of repose, designed to protect defendants, is frequently outweighed, however, where the interests of justice require vindication of the plaintiff's rights.  Id.  Equitable tolling should not apply where there is no factual basis for the equitable tolling.  Shisler v. United States, 199 F.3d 848, 852 (6ᵗʰ Cir. 1999).  However, alleged material facts, which remain in dispute, exist in the current matter.  Plaintiffs have laid a sufficient factual foundation.

This alleged factual foundation consists of the following.  First, Plaintiffs have attempted to find out whether Cramer did, in fact, talk to the HCPD and what, if any, information Cramer relayed to the HCPD that caused the HCPD not to pursue charges at that time.  As of now, Plaintiffs have been unable to obtain this information due to the reluctance of the HCPD to cooperate in Plaintiffs' discovery requests.  It is disingenuous to maintain that Plaintiffs had sufficient knowledge to raise their claims, when presumably, given the stance of the HCDP, the HCPD also did not have sufficient knowledge to sustain an indictment at the time.  Plaintiffs are individuals whose mothers were murdered.  The HCPD is the prosecutorial office of a major Ohio county.  Obviously the HCPD was in a better position to acquire sufficient knowledge.

Plaintiffs were suspicious that Schuholz was the murderer and they were suspicious that a dirty cop was involved in

a cover-up. Defendants ask this Court to find that Plaintiffs'
suspicions amount to the knowledge considered sufficient under the
"excites suspicion" test. The Court is not willing to do so.
Plaintiffs assert questions of material fact that could lead a jury
to determine that the alleged cover-up worked to avail those
suspicions. Plaintiffs, despite their suspicions, had to believe
that the SPD was working to solve the murders not cover them up.
As Plaintiffs note they have, at all times, been most interested in
the arrest, conviction, and sentencing of Schuholz. One cannot
expect the children of murdered mothers, despite doubts, to assume
that law enforcement officials were actually working against their
interests. Plaintiffs did not bring suit initially because, in
spite of everything, they anticipated positive results from the
investigation.

        As noted above, Cramer told the Plaintiffs that he
did not secure an indictment against Schuholz because he was
following the advice of the HCPD. In 1983, Plaintiffs assumed this
was true as Leis excused himself from two cases because of his
involvement and participation in the criminal investigation of the
Wright and Burns's murders. Jim Wright reviewed the investigative
file in 1997 and offered suggestions to the SPD. If he were
certain of a cover-up in 1997, why would he waste his time
reviewing the file and offering suggestions? At this point in
time, both Parties acknowledge that some cooperation between

themselves was occurring.

However, once the Defendants became aware that Plaintiffs were pursuing possible claims against them, they stopped cooperating with the Plaintiffs. The alleged cover-up continued. Once Plaintiffs retained their current counsel, the cover-up allegedly continued with the SPD denying Plaintiffs' access to the file. This Court then intervened and required that the Defendants produce the investigative file.

However, deposition testimony of Cramer reveals that allegedly not all of the investigative file has been turned over to the Plaintiffs. Despite a law suit and this Court's Order, credible allegations exist that the Defendants continue the cover-up by not disclosing all of the investigative case file. It is a question of material fact as to whether indeed information is missing from the file, including supplemental case reports, audiotapes of witness interviews, and notes and tapes of Cramer's interview of Schuholz in 1981. A jury reasonably would question why this material is missing. Arguably, this is evidence of a continued cover-up.

Furthermore, the Plaintiffs maintain that Schappa told Kammeyer that she had been lied to during the investigation and/or that a dirty cop and the police chief had worked to cover-up the murder of her mother. These statements are alleged to have occurred in November 1999 after the announcement of Schuholz's

indictment.  Now, Schappa denies every saying these things.  The Defendants have continued their denial of any wrongdoing, specifically allegations of a cover-up.  Plaintiffs have demonstrated evidence, pointing to Defendants' involvement in a cover-up, sufficient to withstand an attack on summary judgment - a cover-up that has prevented Plaintiffs from knowing with any amount of certainty what was or was not was happening as it related to the investigation of their murdered mothers.

Defendants alleged cover-up at times leads Plaintiffs to believe that a thorough investigation was occurring. At other times the alleged cover-up leads Plaintiffs to believe that not enough evidence existed to indict Schuholz.  Later they are told that indeed a cover-up occurred and that sufficient evidence is now and always was available to indict Schuholz.  Yet, still later they are told that no cover-up occurred.  Plaintiffs, if they ever did have sufficient knowledge to bring their claims, were then misled through one or more acts of the alleged cover-up to believe that the SPD had done nothing wrong.  If ever equity required tolling of the statute of limitations, it is now.

**CONCLUSION**

The Court therefore DENIES Defendants' Joint Motion for Summary Judgment on the Basis that Plaintiffs' Claims are

Barred by Statutes of Limitation (doc. 180).

    SO ORDERED.


Dated: April 27, 2005        <u>s/S. Arthur Spiegel</u>
                            S. Arthur Spiegel
                            United States Senior District Judge