UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PATRICIA KAMMEYER, <u>et</u> <u>al</u>.          :
                                            :    NO. 1:01-CV-00649
          Plaintiffs,                       :
                                            :    **OPINION AND ORDER**
                                            :
     v.                                     :
                                            :
                                            :
CITY OF SHARONVILLE, OHIO, <u>et</u>        :
<u>al</u>.,                                  :
                                            :
          Defendants.                       :


     This matter is before the Court on the various
Defendants' Motions for Summary Judgment (docs. 237, 238, 240), the
Plaintiffs' Single Memorandum In Opposition (doc. 250), and the
Various Defendants' Replies in Support of Their Respective Motions
for Summary Judgment (docs. 261, 256, 260).  Also, before the Court
are a number of other Motions.  These are:

          1.  Emergency Motion of Plaintiffs to Dismiss
          State Law Claims Against Defendants Only to
          Extent Such Claims Accrued On or After April
          9, 2003 (doc. 301), Defendants' Response (doc.
          304), and the Plaintiffs' Reply (doc. 305).

          2.  Joint Motion of all Defendants to Certify
          State Law to Ohio Supreme Court (doc. 293),
          the Plaintiffs' Memorandum in Opposition (doc.
          296), and the Defendants' Reply (doc. 297)

          3.  Plaintiffs' Motion to Quash Supboenas to
          Plaintiffs' Attorneys (doc. 197), the Joint
          Memorandum of Defendants in Opposition to
          Motion to Quash (doc. 203), and the
          Plaintiffs' Prehearing Submission on Their
          Motion to Quash (doc. 220).

4.  Joint Motion of Defendants to Vacate Order (doc. 205).

5.  Intervenors' Motion to Intervene (doc. 242), the Defendants' Various Motions in Opposition (docs. 244, 255), the Plaintiffs' Response (doc. 254), and the Intervenors' Reply Memo (doc. 262).

The Facts have been thoroughly discussed in earlier Orders by this Court (See e.g., doc. 282). The Court will recite the facts as stated in its earlier Oder (doc. 282).

**FACTS**

The Defendants aptly describe the basic alleged facts of this case in one sentence: "Plaintiffs claim that Defendants were involved in an alleged conspiracy to cover up facts necessary to prosecute Albert Schuholz [(hereinafter "Schuholz")] for the 1981 murders of Marie [Wright] Schuholz [(hereinafter "Wright')] and Starla Burns [(hereinafter "Burns")]." Of course the uncontroverted and alleged facts in this case are significantly more particularized. The following are the facts of this case, as generally alleged by Plaintiffs.

Wright and Burns were murdered in the City of Sharonville, Ohio (hereinafter "Sharonville") on May 8, 1981 (doc. 187). The Plaintiffs in the instant action are the adult children of Wright and Burns (Id.). In total, four adult children of Wright and Burns constitute the Plaintiffs (Id.). Each Plaintiff resided

outside of the greater Cincinnati area at the time of the murders and have remained situated as such since the murders (Id.).

Plaintiffs maintain that extensive evidence points to Schuholz as the culprit (Id.). This extensive evidence, assert the Plaintiffs, consists of:

> (1) Wright and Schuholz were engaged in an acrimonious divorce at the time of the murders;
>
> (2) Wright hired detectives to follow Schuholz to document his affair with another woman, Audrey Stevens (hereinafter "Stevens");
>
> (3) Schuholz forged Wright's name on a separation agreement favoring Schuholz in the division of his and Wright's marital property;
>
> (4) immediately prior to the murders, proof of the forgery was emerging through expert reports including an expert hired by Schuholz's attorney;
>
> (5) several police reports were filed before the murders reflecting complaints made by Wright regarding violence directed toward her, including death threats made against her by Schuholz;
>
> (6) one of these police reports, taken by Sharonville police officer Alan Hayes two months prior to Wright's murder, clearly indicated Wright's fear that Schuholz intended to kill her;
>
> (7) another police report, filed in January 1981, revealed that Schuholz attempted to hire Perry Baker to kill Wright;
>
> (8) several attorneys, including Wright's Attorney, Ed Utz (hereinafter "Utz"), came to the Sharonville Police Department (hereinafter "SPD") within hours of the muders and related

detailed facts about the efforts of Schuholz
to hire individuals to kill Wright;

(9) Wright's children, Plaintiffs in this
action, also provided specifics to the SPD
regarding the history of abuse prevalent in
Wright and Schuholz's marriage;

(10) at Wright's grave just days after the
murder Schuholz approached Jim Wright,
Wright's son, and commented, "I got her and I
will get the rest;"

(11) Wright's best friend, Karen Cook, was
reportedly also threatened with death for
testifying in favor of Wright at the divorce
proceedings; and

(12) presumably Schuholz relied on "vague"
alibi statements from Stevens at the time of
the murder to whom Schuholz paid $25,000.00
the month following the murder.

(Id.). Plaintiffs maintain that at the time of and since the

murders they have always been supportive of the SPD's efforts in

investigating the murders (Id.).

Plaintiffs aver that for many years they lived in fear of

Schuholz (Id.). Jim Wright maintains that Schuholz directly

threatened his life (Id.). Patricia Kammeyer (hereinafter

"Kammeyer"), daughter of Wright, maintains that Schuholz threatened

her in the past as a means of asserting control over Wright (Id.).

Plaintiffs called and wrote to the SPD regularly during the initial

investigation of the murders (Id.).

What is hotly disputed in this action is the claim by

Plaintiffs that Defendants have lied and pursued a cover-up that

-4-

has continued to the present day (Id.).  Defendant Jim Cramer (hereinafter "Cramer") was the lead detective for the SPD (Id.). Cramer was responsible for felony investigations, including the murders of Wright and Burns (Id.).  The Plaintiffs maintain that Cramer was largely unsupervised and the final policymaker as to the murder investigation of Wright and Burns.  Defendant William Nuss (hereinafter "Nuss") was the then SPD Chief and Cramer's brother-in-law (Id.).

Plaintiffs submit that during the investigation of the murders, Cramer had a pattern of failing to return phone calls (Id.).  Plaintiffs claim he showed little compassion for the victims of the murder and failed to deal justly with suspects as well as failed to communicate with other officers in the department concerning the investigation (Id.).  Plaintiffs assert that this lack of compassion coupled with the above mentioned failures harmed the quality of the investigation (Id.).  Additionally, Plaintiffs avow that Nuss ignored these problems and allowed them to worsen (Id.).  On September 26, 1988, the entire SPD command staff, including Defendant Lieutenant (now Chief) Mike Schappa (hereinafter "Schappa"), wrote a letter to Nuss which stated, "the below signed Sharonville Police Personnel submit to you the primary immediate problem within the department: Lieutenant James Cramer" (Id.).  Subsequently, Sharonville conducted an investigation;

-5-

Cramer was removed of his duties as lead detective and was replaced by Greg Homer (hereinafter "Homer") (Id.). Ultimately, on May 15, 1990, Cramer resigned from the SPD (Id.). Plaintiffs profess that Cramer moved to Indiana after his investigation and has resided in Indiana ever since (Id.).

Cramer never secured an indictment of Schuholz (Id.). Cramer, in deposition, stated that he advised the Plaintiffs that in not securing an indictment he was merely following the advice of the Hamilton County Prosecutor (Id.). According to Plaintiffs and Cramer, in 1981 Cramer presented the case files to then Hamilton County Prosecutor Simon Leis (hereinafter "Leis") as well as one or more assistants of Leis whereupon he was advised that there was not sufficient evidence to proceed (Id.).

Plaintiffs maintain no documentation exists in the SPD murder investigation file that reflects this meeting between Cramer and Leis (Id.). Plaintiffs, however, argue that some contact between Cramer and Leis took place (Id.). In support of this claim, Plaintiffs point to a letter dated April 18, 1983 from Utz (Id.). The letter purportedly indicates that Leis (who was in 1983 a common pleas judge) recused himself from two cases filed by the estate because of "his involvement and participation in the criminal investigation of the death of Marie Schuholz [Wright]" (Id.). Utz is now deceased (Id.). Additionally, Plaintiffs

-6-

maintain that Schappa told Kammeyer that Cramer had met with Leis (Id.).

In 1997, Detective Dale Dorning (hereinafter "Dorning") of the SPD reopened the murder investigation (Id.). In 1999, through the efforts of this investigation, an indictment was secured against Schuholz (Id.). Plaintiffs claim that Dorning re-interviewed many of the persons that had contacted Cramer sixteen years earlier about the murders or persons that were identified in the case file, presented an accurate summary of his information to the prosecutor, and, subsequently, secured the indictment based substantially on the same evidence that was available in 1981 (Id.).

Plaintiffs argue that Dorning raises serious questions about whether in 1981 Cramer accurately relayed the evidence to the Hamilton County Prosecutor and his assistants concerning the murders (Id.). To sustain this assertion, Plaintiffs highlight portions of Dorning's deposition in which Dorning asserts that Cramer told him that indeed he (Cramer) had met with the Prosecutor in 1981 (Id.). During this meeting, Cramer reportedly recited certain information to the Prosecutor which presumably would have led the Prosecutor to indict Schuholz; yet, the Prosecutor maintains that had the information now available actually been known by the Prosecutor's office an indictment surely would have

-7-

occurred (Id.).   Plaintiffs argue that the evidence in 1981 implicating Schuholz was so overwhelming that this evidence, itself, points to Cramer misleading the Prosecutor (Id.). Plaintiffs assert that at all times relevant to the murder investigation, they were led to believe that Cramer was acting consistent with the advice of the Hamilton County Prosecutor (Id.).

Plaintiffs maintain, citing Homer's deposition, that when Homer replaced Cramer as lead detective a comprehensive review of the murder investigations was not completed (Id.).  Furthermore, according to Homer's deposition, he did not actively work the case (Id.).  In 1990, Nuss resigned as Chief and was replaced by Schappa (Id.).  At this time, according to Schappa's deposition, a review of the Wright and Burns murder investigation was not conducted (Id.).   No evidence, according to Plaintiffs, exists showing contact between the SPD and the Hamilton County Prosecutor's Office (hereinafter "HCPO") during this time; as a result Plaintiffs insist the investigation was "cold" (Id.).   This activity, or inactivity as Plaintiffs describe it, occurred during the years 1989-1997 (Id.).

During the years 1997 to 2000, Dorning's activities revolving around the investigation commenced and information was shared with the Plaintiffs (Id.).   This activity began with a request by Jim Wright to access the investigative file (Id.).

-8-

According to Jim Wright, he had grown frustrated with the inactivity and was hoping to read the file and suggest to the investigators a course of action (Id.). Jim Wright avers that he was permitted to read three "binders" of information (Id.). Jim Wright indicates that after reading the material the first time he wrote a letter summarizing some of his observations (Id.). Sometime after the writing of this letter, Dorning was assigned to the case (Id.).

Dorning also uncovered evidence that Cramer had some type of personal or business relationship with Schuholz prior to the murders of Wright and Burns (Id.). Allegedly Cramer collected bad checks on behalf of Schuholz (an alleged loan shark) or personally borrowed money from him (Id.). Plaintiffs submit that at no time did Cramer or any other Defendant disclose this conflict of interest to them (Id.). Dorning, viewing Cramer's work on the case as suspect, criminally investigated Cramer for his part in the case (Id.).

As noted above, ultimately in 1999 Schuholz was indicted for the murders of Wright and Burns (Id.). This indictment was announced by the Hamilton County Prosecutor at a press conference on November 12, 1999 (Id.). According to Plaintiffs, at the time of the 1999 indictment, Schappa told Kammeyer that he had "learned in the past few years about your case and the dirty cop" and that

the Wright murder investigation was delayed by a "cover-up" (<u>Id</u>.). Additionally, according to the deposition of Kammeyer, Schappa told her that she along with her brother Jim Wright had been "lied to from the beginning" (<u>Id</u>.).

Plaintiffs assert that the cover-up has continued from 2000 to the present (<u>Id</u>.). Evidence of this continued cover-up consists of the following. In 1999, the Plaintiffs retained Jay Clark (hereinafter "Clark") as their counsel (<u>Id</u>.). Plaintiffs maintain that their intent in retaining Clark was to proceed with any litigation that was appropriate after Schuholz was convicted (<u>Id</u>.). On April 7, 2000 the Plaintiffs learned that Schuholz had been found incompetent in another federal prosecution (<u>Id</u>.). This additional prosecution involved the attempted murder of a subsequent wife of Schuholz's in 1998 (<u>Id</u>.). Schuholz pleaded guilty to this attempted murder but was declared incompetent prior to sentencing in that case. <u>See</u> <u>United States v. Albert Schuholz</u>, Case No. 98-CR-68 (E.D. KY 1998). This declaration of incompetency, unfortunately, made the prosecution of Schuholz for Wright and Burns's murders less likely (<u>Id</u>.).

Plaintiffs aver that once Clark was retained and it was made known to the City of Sharonville that Clark would be representing the Plaintiffs for any potential claims arising from the murder and the murder investigation, the City of Sharonville

ceased cooperating with them (Id.).  Dorning retained Clark as well
to represent him regarding Dorning's employment with the City of
Sharonville (Id.).  Clark declared that Dorning was being pressured
by the City of Sharonville because Dorning had uncovered misconduct
by City of Sharonville employees (Id.).  Clark sent a letter to the
City of Sharonville Law Director, Tom Keating (hereinafter
"Keating"), in July 2000, indicating Dorning's employment situation
- namely, that Dorning felt pressure due to the City of
Sharonville's uneasiness concerning Dorning's investigation into
the Schuholz murder case and the misconduct discovered (Id.).
Plaintiffs state that in response to this letter Keating reacted
with surprise that Clark knew of the allegations of misconduct and
requested that Dorning not reveal any further information (Id.).
In Keating's return letter, he stated that "[n]o wrongdoing has
ever been alleged against a current member of the Department"
(Id.).  As such, the Plaintiffs maintain the cover-up continued
(Id.).

    In 2001, Plaintiffs retained new counsel, Alphonse A.
Gerhardstein (hereinafter "Gehardstein") and Paul M. Laufman, who
currently remain as counsel for Plaintiffs (Id.).  On May 25, 2001
Gehardstein requested access to the investigative file (Id.).  On
June 5, 2001, Gehardstein asserts that Schappa denied access
because the file was part of an ongoing investigation (Id.).  On

-11-

January 14, 2002, after this instant action was filed, City of
Sharonville attorney Larry Barbiere again denied Gehardstein access
to the file (Id.). Eventually, Plaintiffs filed a Motion to
Compel, which this Court granted (doc. 40). Additional and more
complete access to the file was Ordered by the Court (doc. 64).

Plaintiffs, as a result of information revealed in
Cramer's deposition, maintain that material is missing from the
investigative file - specifically, according to Cramer, the
following: supplemental case reports; audiotapes of witness
interviews, and all notes and tapes of his interview of Schuholz in
June 1981 (Id.). Dorning agrees that the audiotapes of the 1981
interviews are indeed missing (Id.). Schappa has indicated that he
is not certain that the investigative file is complete (Id.). SPD
ultimately admitted that the audiotapes of interviews conducted
prior to 1997 and all records of the Cramer interview of Schuholz
are missing (Id.).

Plaintiffs note that Schappa now denies ever telling
Kammeyer that she had been lied to during the investigation and
that a dirty copy had thwarted the investigation   (Id.).
Additionally, the City of Sharonville, despite its criminal
investigation of Cramer's conduct, now asserts that Cramer followed
all city policies in the investigation and did nothing wrong (Id.).
All of the above, maintain Plaintiffs, signifies the continued

-12-

cover-up from 2000 to the present (Id.).

The facts, as detailed above, are long, detailed, and complicated. The procedural history in this matter is no different. This matter has been on the Court's docket since September 25, 2001 when Plaintiffs filed their initial Complaint (doc. 1). Three Amended Complaints have subsequently been filed (docs. 2, 45, 119). Discovery has been nothing less than rancourous, as the Parties have filed numerous Motions to Compel and Motions to Quash. The Court's Orders pertaining to discovery matters as well as other issues have been appealed to the Sixth Circuit. Defendants have filed Motions to Dismiss, which the Court has denied and Motions for Summary Judgment on Statute of Limitations which the Court has also denied. Now, the Defendants' several Motions for Summary Judgment on substantive issues are before the Court.

**PRELIMINARY MOTIONS**

Before turning to the Defendants' Motions for Summary Judgment, the Court will dispose of Plaintiffs' Emergency Motion to Dismiss the State Law Claims (doc. 301). The Court has reviewed said Motion, the Response, and Reply thereto (docs. 301, 304, 305). The Court hereby denies the Motion in that it dismisses without prejudice all state claims against the Defendants, not just state claims arising before a date certain as requested by Plaintiffs.

A district court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367, in a civil action of which the district court has original jurisdiction, over all other claims that are so related to the claims which the court has original jurisdiction provided those other claims form part of the same case or controversy under Article III of the United States Constitution. See e.g., Olden v. LaFarge Corp., 383 F.3d 495, 499-00 (6th Cir. 2004); 28 U.S.C. § 1367(a). Section 1367(c) permits the district court to decline supplemental jurisdiction over a claim under Section 1367(a) in four circumstances. First, if the "claim raises a novel or complex issue of State law." Second, if the "claim substantially predominates over the claim or claims over which the district court has original jurisdiction." Third, if "the district court has dismissed all claims over which it has original jurisdiction." And, fourth, if "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

Although this Court has previously exercised supplemental jurisdiction over Plaintiffs' state law claims, the Court now divests itself of that jurisdiction. It does so because "exceptional circumstances" exist compelling it to do so. First, the Court notes that this case has been pending on the Court's docket for nearly five years (see doc. 1). Furthermore, the facts

-14-

giving rise to this claim date to 1980.  Twenty-six years later the Plaintiffs continue to seek their day in court.  If the events giving rise to this litigation are as Plaintiffs maintain, then they have endured the most horrific of circumstances as a result of the alleged egregious conduct of government officials - officials who society is expected to trust and rely upon.

As Plaintiffs' note, Defendants have thus far filed four interlocutory appeals in this matter (doc. 305).  A fifth will presumably occur if the Court denies the Defendants' various Motions for Summary Judgment - which it will do.  The Court is fairly certain that attorneys for the Defendants will file an interlocutory appeal immediately following this Court's denial of their Motion for Summary Judgment on the issue of state statutory immunity pursuant to Ohio Revised Code Section 2744.02(C).  This presumption arises because of the Court's experience with another case on its docket, Chesher v. Neyer, Case No. 1:01-CV-00771 (S.D. Ohio).  Some of the attorneys representing Defendants in the current matter also represent the Defendants in Chesher.  In Chesher, defendants assert the claims based on conduct that starts before but continues after the effective date of amended § 2744.02(C) permit defendants to invoke the right to an interlocutory appeal when a claim of immunity is denied. See Chesher.  As the Chesher matter is now before the Sixth Circuit

Court of Appeals on this issue, the Court is divested of jurisdiction over that matter.

The result in the instant litigation would be the same if an interlocutory appeal were filed. The Court views this as an "exceptional circumstance" in which "compelling reasons" exist to divest itself of jurisdiction over Plaintiffs' state law claims. It is time for the instant matter to reach a resolution. Elimination of the state law claims from this matter will prevent a similar occurrence as in <u>Chesher</u>. Furthermore, by eliminating the state law claims from this litigation, the matter is greatly simplified as only Plaintiffs' federal civil rights claims will remain. This will make the case easier to try and much easier for a jury to reach a verdict. The Court views Plaintiffs' proposed solution (<u>See</u> doc. 301) as only complicating the matter. Additionally, the issue of state statutory immunity pursuant to § 2744.02(C) has become a complex and novel state legal issue, best left either to an Ohio court to decide or for the Sixth Circuit to determine in the pending <u>Chesher</u> appeal. For these reasons, pursuant to 28 U.S.C. § 1367(c), the Court finds that divestment of its supplemental jurisdiction is appropriate.

The Court also notes that the Sixth Circuit has held that a district court "has the inherent power to manage its docket" so long as the management is in "harmony with the Federal Rules of

Civil Procedure.  In re NLO, 5 F.3d 154, 157 (6th Cir. 1993), See also, In re Prevot, 59 F.3d 556, 566 (6th Cir. 1995).  The Court has discussed above why its decision to divest itself of supplemental jurisdiction is appropriate pursuant to 28 U.S.C. § 1367(c).  The Court does not find tension between its current action and the Federal Rules of Civil Procedure.  Furthermore, exercise of this Court's inherent power to manage its docket by dismissing Plaintiffs' state law claims without prejudice is in harmony with federal law (i.e., 28 U.S.C. § 1367).

        The Court turns next to the Defendants' Joint Motion to Certify Question of State Law to Ohio Supreme Court (doc. 293).  Defendants note in this motion that the question of whether Ohio Revised Code Chapter 2744 is constitutional may be determinative of this proceeding (Id.).  However, the Court has now dismissed without prejudice all state claims against the Defendants.  As such, the constitutionality of Chapter 2744 is a non-issue in this case.  Accordingly, the Defendants' Motion is denied as moot (doc. 293).  The only claims of Plaintiffs which now remain for the Court to address are their Section 1983 Civil Rights claim against the City of Sharonville, Cramer, Nuss, and Schappa alleging violations of rights to equal protection, substantive due process and access to courts.

        Next, the Court addresses Defendants' Motion to Vacate Order of November 11 [sic], 2004 (doc. 192) (doc. 205).  In this

-17-

Motion, the Defendants request the Court to vacate its Order in which it granted Plaintiffs' an extension of time to respond to Defendants' Joint Motion for Summary Judgment on Statute of Limitation Grounds (doc. 192). The Court denies this motion as moot since Plaintiffs have already filed their Response to that Motion (doc. 187).

The Court grants Plaintiffs' Motion to Quash (doc. 197). In this Motion, the Plaintiffs move this Court pursuant to Rule 45 of the Federal Rules of Civil Procedure to quash the two subpoenas and associated notices of deposition served upon the counsel for Plaintiffs, Alphonse Gehardstein and Paul Laufman (Id.). Defendants argues that deposing Mr. Gehardstein and Mr. Laufman is essential to adequately pursue their statute of limitations defense (doc. 203). The Defendants as well as Plaintiffs aptly note the three-part test used to determine whether a party may take the deposition of the opposing party's counsel. See Shelton v. American Motors Corp., 805 F.2d 1323, 1327 (8th Cir. 1986); Nationwide Ins. Co. v. Home Ins. Co., 276 F.2d 261 (6th Cir. 2002). Shelton requires the party seeking the deposition to show that:

> 1. No other means exist to obtain the information;
>
> 2. The information is nonprivileged and relevant; and
>
> 3. The information is crucial to the presentation of the case.

The Court finds that Defendants fail to establish that "no other means exist to obtain the information" they seek. Defendants state in their Opposition that "[t]he only new information [sought] is . . . a statement by Plaintiffs' current counsel about that part of the already produced evidence of which they were aware when this lawsuit was filed" (doc. 203). Defendants are merely seeking information they already have in a different form.  Having admitted that they already possess the information, Defendants cannot now argue that there exist no other means to obtain the information.  As Prong One of <u>Shelton</u> has not been met, the Court need not address Prongs Two and Three. Therefore, Plaintiffs' Motion to Quash is granted.

Finally, the Court addresses the Motion to Intervene filed jointly by North East Insurance Company, Scottsdale Insurance Company, Folksamerica Reinsurance Company, Ohio Government Risk Management Plan, and United National Insurance Company (hereinafter collectively "the Insurers") (doc. 242).  The Insurers seek intervention for the limited purpose of submitting jury instructions, jury interrogatories and verdict forms (doc. 242). As a courtesy, the Court invited the Insurers to attend the May 10, 2005 Settlement Conference.  At this Conference, the Court considered the Insurer's reasons for seeking intervention and the objections of the Parties.  The Court was not convinced by the reasoning of the Insurers and at the Conference indicated that it

would not arrange this case around the best interests of the insurance companies. The Court is persuaded by the Defendants City of Sharonville and Schappa's Memorandum in Opposition to the Insurer's Motion to Intervene (doc. 255).

Furthermore, the Insurers argue that the complexity in this case due to the number of varying claims necessitates their intervention (doc. 262). However, that complexity no longer exists, as all state law claims have been dismissed and only Plaintiffs' Section 1983 claims remain. Accordingly, the Court denies the Insurer's motion.

**APPLICABLE LEGAL STANDARD**

The narrow question that this Court must decide on a motion for summary judgment is whether there exists a "genuine issue as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court elaborated upon the appropriate standard in deciding a motion for summary judgment as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of showing the

absence of a genuine issue of material fact as to an essential element of the non-movant's case. <u>See</u> <u>id</u>. at 321; <u>Guarino v. Brookfield Township Trustees</u>, 980 F.2d 399, 405 (6th Cir. 1992); <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1479 (6th Cir. 1989). If the moving party meets this burden, then the non-moving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e); <u>see</u> <u>Guarino</u>, 980 F.2d at 405.

As the Supreme Court stated in <u>Celotex</u>, the non-moving party must "designate" specific facts showing there is a genuine issue for trial. <u>Celotex</u>, 477 U.S. at 324; <u>Guarino</u>, 980 F.2d at 405. Although the burden might not require the non-moving party to "designate" facts by citing page numbers, "'the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the non-moving party relies.'" <u>Guarino</u>, 980 F.2d at 405, <u>quoting</u> <u>Inter-Royal Corp. v. Sponseller</u>, 889 F.2d 108, 111 (6th Cir. 1989).

Summary judgment is not appropriate if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). Conclusory allegations, however, are not sufficient to defeat a motion for summary judgment. <u>See</u> <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1162 (6th Cir. 1990). Furthermore, the fact that the non-moving party fails to respond does not lessen the burden on the moving party or the court to demonstrate that summary

judgment is appropriate.  <u>See</u> <u>Guarino</u>, 980 F.2d at 410; <u>Carver v.</u>
<u>Bunch</u>, 946 F.2d 451, 454-55 (6th Cir. 1991).

**ANALYSIS**

     Sharonville argues that Plaintiffs have failed to
demonstrate the existence of an unconstitutional practice, policy,
or custom attributable to it (doc. 233).  The Plaintiffs aptly note
that Section 1983 liability can attach to a local government under
three theories (doc. 250).  First, the unconstitutional action by
the local government was taken pursuant to formal policy.  Second,
the action taken was pursuant to a longstanding practice or custom.
Third, the action was taken by a "final policymaker."  <u>Monell v.</u>
<u>Dep't. of Soc. Servs. Of the City of New York</u>, 436 U.S. 658 (1978).
The Plaintiffs argue that Mike Schappa (hereinafter "Schappa") was
at all relevant times a policymaker for Sharonville in that he was
the lead detective (doc. 250).  As lead detective, Schappa
presented cases to the local prosecutor, pursued criminal
investigations and maintained evidence associated with criminal
investigations (<u>Id</u>.).  Additionally, the Plaintiffs maintain that
Sharonville had a long standing custom or procedure or <u>de</u> <u>facto</u>
policy of failing to supervise the lead detective (<u>Id</u>.).

     Plaintiffs also aptly note that determining whether an
employee is a final policymaker is a question of state law and
should be decided by the court as a matter of law.  <u>See</u> <u>Jett v.</u>
<u>Dallas Indep. Sch. Dist.</u>, 491 U.S. 701 (1989).  "[T]he trial judge

-22-

must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." Jett at 737. The Supreme Court has further noted, "municipal liability under § 1983 attaches where – and only where – a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. City of Cincinnati, 475 U.S. 469, 483-484 (1986). Final policy making authority may be granted by a formal enactment or an official who possesses such authority may delegate it.  Id. at 483.  Further elaborating on local government liability under Section 1983 pursuant to a final policymaker's decision, the Supreme Court has stated that "liability of local governments under § 1983" is not an "all or nothing" inquiry; rather, ". . . § 1983 instruct[s] us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." McMillian v. Monroe County, Ala., 520 U.S. 781, 785 (1997).

The Plaintiffs cite a number of cases where policymaking was specialized or limited to a specific area (doc. 250).  For example in Jett, the Court determined that the school superintendent was the "final policymaking authority in the area of employee transfers." Jett at 738.  In Lytle v. Carl, 382 F.3d 978

-23-

(9th Cir. 2004), an assistant superintendent was the final policymaker for employee discipline. In Webb v. Sloan, 330 F.3d 1158 (9th Cir. 2003), a deputy district attorney was deemed the final policymaker where he had authority to dismiss charges without consulting with his supervisor. In Kujawski v. Bd. of Comm'rs of Bartholomew County, 183 F.3d 734 (7th Cir. 1999), the court reversed summary judgment in favor of defendants regarding whether the chief probation officer had been delegated authority to make employment policies for the probation department.

Finally, the Plaintiffs discuss in length the Sixth Circuit's opinion in Monistere v. City of Memphis, 115 Fed. Appx. 845 (6th Cir. 2004). In Monistere detectives were lead investigators into alleged police misconduct. Id. at 849. Two police officers were accused of stealing $3,000.00 from an individual whom the officers had pulled over for a routine traffic stop. Id. at 848. Upon returning to the police station, the two officers were investigated and as part of that investigation were strip searched. Id. at 848-49. The City of Memphis was held liable for the investigators' actions pursuant to Section 1983. Id. at 853. In reaching that conclusion, the Sixth Circuit rejected the city's argument that no statute or written regulation gave policymaking authority to the lead investigators. Id. at 852-53. The court stated:

Contrary to the City's position on this issue,

-24-

the facts presented during the trial
demonstrate that [lead investigator] Embrey
did not merely exercise discretion but rather
acted as a final policymaker within the
context of this case.  During the trial,
Embrey testified that, in his capacity as the
lead investigator, he had the right to make
decisions regarding his investigation of
[plaintiffs] Monistere and Jones.  His
decision was final.  There is no evidence in
this record that he received any direction
from his supervisors until after the strip
search had been completed.  Pilot [a
supervisor with codified policymaking
authority] neither reviewed nor challenged his
decision-making authority.  In fact, Embrey
testified that she rarely intervened in his
investigations.  Furthermore, there is no
evidence that Embrey was constrained by the
City's "unwritten" policy which governed
internal investigations because it was the
practice within the Police Department to give
unfettered discretion to its ISB members.  In
sum, the record clearly supports the
conclusion that Embrey's decision was (1)
final, (2) not reviewable, and (3)
unconstrained by the existing policies and
practices of his supervisory officers.  It is
our judgment that, when applying the standards
of <u>Feliciano</u>, Embrey was delegated final
policymaking authority which is sufficient to
impose municipal liability upon the City under
§ 1983.

<u>Id</u>. at 852-53.

Plaintiffs note that the police chief is the policymaker

for the Sharonville Police Department (doc. 250).  Nuss was police

chief from 1971 to 1990 and Schappa, the present chief, has been so

since 1990 (<u>Id</u>.).  Plaintiffs argue that when the evidence is

viewed in a light most favorable to them it is apparent that Nuss

permitted Cramer to exercise unfettered discretion in conducting

-25-

murder investigations (Id.).  The Plaintiffs highlight that Nuss did not review Cramer's decisions, that no policies were in place constraining Cramer's exercise of discretion thus resulting in the custom for the lead detective (i.e., Cramer) to make and implement his own policies regarding murder investigations (Id.).  The Court agrees with Plaintiffs.  Nuss, as the policymaker for the Sharonville Police Department, delegated the authority to Cramer to act as the policymaker in the context of this case while Lead Detective.  Thus, Cramer's actions were those of a final policymaker.

In an addition, arguing local liability pursuant to a custom or policy, the Plaintiffs note that local government liability can be found in instances where a serious failure to supervise employees amounts to deliberate indifference to the rights of persons with whom the employees come into contact.  Leach v. Shelby County Sheriff, 891 F.2d 1241, 1247-48 (6th Cir. 1989).  Plaintiffs state that the "difference between a straight policy or custom argument and one based on a failure to supervise is the need to prove 'deliberate indifference.'" See e.g., Bordanaro v. McLeod, 871 F.2d 1151, 1157-59 (1st Cir. 1989); McKenna v. City of Memphis, 785 F.2d 560, 562 (recognizing a theory of municipal liability based on a failure to supervise and discipline officers).  When attempting to attach liability through a failure to train or supervise theory, it must be shown that the failure was a

"deliberate" or "conscious" choice by the municipality.  See City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989).  Determining whether deliberate indifference is present in failure to train or supervise cases involves applying an objective rather than subjective standard.  See e.g., Farmer v. Brennan, 511 U.S. 825, 841 (1970).

Plaintiffs argue that the evidence against Schuholz in 1981 was so strong that some type of criminal investigation should have been pursued (doc. 250).  Yet, the Plaintiffs note that Nuss and Schappa only reviewed material from open criminal investigations when Cramer deemed it relevant to consult with them (Id.).  Furthermore, Plaintiffs highlight that Cramer's personnel file, spanning thirty-two years of service, is devoid of any performance evaluations (Id.).  This, argue Plaintiffs, reveals that Cramer was not supervised at all in this murder investigation (Id.).  Plaintiffs also note that the families of Wright and Burns sent letters to the mayor and Nuss which should have put Sharonville on notice of the need to supervise Cramer (Id.).  Lastly, Plaintiffs stress the "command staff mutiny in 1988," wherein Schappa and the entire command staff reported their dissatisfaction with Cramer's arrogance, failures in communication, and failures to follow through on his policing efforts (Id.).  Accordingly, the Court finds that genuine issues of material fact are present as to this issue, necessitating deliberation by a

-27-

reasonable trier of fact.

As the Court has stated in earlier Orders, the conduct as alleged in this case, if true, most definitely amounts to conduct that "shocks the conscience" (docs. 93, 130).  A Section 1983 claim may be based upon a violation of substantive due process by actions that "shock the conscience." <u>Braley v. City of Pontiac</u>, 906 F.2d 220, 224-25 (6th Cir. 1990), <u>Mertik v. Blalock</u>, 983 F.2d 1353, 1367-68 (6th Cir. 1993), <u>Culberson v. Doan</u>, 125 F. Supp. 2d 252, 267 (S.D. Ohio, 2000).  The Court turns to its language used in an earlier Order.  Its determination that Defendants' conduct shocks the conscience has not changed.  Where enforcement officers "are afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action. . .their actions will be deemed conscience-shocking if they were taken with 'deliberate indifference' towards the plaintiffs' federally protected rights." <u>Claybrook v. Birchwell</u>, 199 F.3d 350 (6th Cir. 2000).

A reasonable jury could conclude that: (1) Sharonville had a policy of delegating final decision-making authority to the lead detective on a particular case; (2) Cramer ignored or hid evidence; (3) Cramer failed to take action despite Plaintiff James Wright's retelling of Schuholz's statement that he "got her and would get the rest of them; (4) Cramer did not share enough information with prosecutors so that no indictment was sought

despite evidence to support the issuance of indictment; and (5) the decision to cover-up the murders of Starla Burns and Marie Wright Schuholz was made repeatedly over the last twenty years (doc. 58). If the jury should so conclude, "conscience shocking" conduct will have been perpetrated. However, genuine issues of material fact exist making a determination of this issue at the summary judgment posture unwarranted. Whether the Defendants' conduct violated the substantive due process rights of the Plaintiffs should be made by a reasonable jury, not the Court.

The Court likewise finds that genuine issues of material fact exist as to Plaintiffs' Equal Protection claim and their Denial of Access to Court claim. Again, the Court finds no reason to change its legal opinion on these two issues that it has expressed in earlier Orders (docs. 93, 130). For the sake of brevity, the Court does not repeat the analysis here. What it does emphasize is that factual issues of a material nature exist that must be sorted out by the trier of fact. Accordingly, Plaintiffs' Equal Protection and Denial of Access to Court claims remain valid claims.

**CONCLUSION**

The Court will now summarize this Order. First, Plaintiffs' Motion to Quash is GRANTED (doc. 197). Second, the Court DENIES AS MOOT the Defendants' Motion to Vacate November 11 [sic] 2004 Order (doc. 205). Third, it DENIES AS MOOT Defendants'

Joint Motion to Certify State Law to Supreme Court of Ohio (doc. 293).  Fourth, the Court DISMISSES WITHOUT PREJUDICE all state law claims asserted against all Defendants.  In so doing it DENIES the Emergency Motion of Plaintiffs to Dismiss State Law Claims Against Defendants Only to Extent Such Claims Accrued On or After April 9, 2003 (doc. 301).  Fifth, the Court DENIES the Motion to Intervene filed by the Insurers (doc. 242).  Finally, as no state law claims remain, the Court has reviewed the Defendants' Summary Judgment Motions only as they pertain to Plaintiffs' Section 1983 claims. After review, the Court does not find these Motions well-taken. Accordingly, Defendants' Motions for Summary Judgment are DENIED (docs. 237, 238, 240).  Plaintiffs Section 1983 claims remain against Defendants City of Sharonville, Cramer, Nuss, and Schappa. This matter is hereby SET for a Final Pre-Trial Conference at 9:00 A.M. on May 31, 2006 and a One-Week Jury Trial to commence June 20, 2006.


        SO ORDERED.



Dated: April 26, 2006        s/S. Arthur Spiegel_____

                             S. Arthur Spiegel
                             United States Senior District Judge




                            -30-